UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | Case No. 21-CR-234-CJN |
| | : | |
| **JOSEPH W. FISCHER,** | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO CLARIFY AND MODIFY CONDITIONS OF RELEASE**

The United States of America by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in opposition to defendant Joseph Fischer's Motion to Clarify and Modify Conditions of Release. ECF Nos. 47-48.

Defendant's request to modify or clarify his release conditions goes a bit too far. Defendant, a police officer who ran at a police line inside the U.S. Capitol on January 6, 2021 during the riot, is charged with multiple felonies. His conduct before, during, and after January 6 raises concerns that he poses a danger to the community—concerns that originally led the government to seek his detention. Defendant is already released on relatively lenient conditions. At a minimum, to ensure the safety of the community, he needs to stay away from weapons, whether they be firearms, bows, or muzzleloaders.

When defense counsel asked, the government could not bless his participation in the hunting trip as described. Pretrial Services agrees. Using a bow or muzzleloader would be a clear violation of defendant's release conditions, and the Court should not grant an exception here, where defendant's request is not based on necessity, but on his desire to participate in recreation. Setting aside the issue of the weapons defendant has admitted he would like to use, the government is further concerned about the likelihood that defendant will possess firearms or other weapons,

1

either actually or constructively, should he participate in the trip, where he will be surrounded by family members using them—it seems altogether too inviting under the circumstances.

The Court should deny Fischer's motion.

## FACTUAL BACKGROUND

### I. Fischer's Communications Before January 6

Over text message, defendant discussed plans for January 6 in Washington, D.C., sometimes in violent terms. On December 16, 2020, he sent a text message to another individual, stating "If Trump don't get in we better get to war or we will lose our country." On January 3, defendant said (via text), "Are you going to D.C on January 6th.....!!!!! Its going to be historic !!!!!" A little more than twenty minutes later, defendant wrote, "Take democratic congress to the gallows," followed by "Can't vote if they can't breathe..lol."

That same day, defendant, an eighteen-year veteran of the North Cornwall Township Police, texted his police chief, "I might need you to post my bail." He wrote, "It might get violent.... they should storm the capital and drag all the democrates [sic] into the street and have a mob trial."

### II. Fischer's Participation in the Capitol Riot

At approximately 3:24 p.m. on January 6, Fischer stood just outside the East Rotunda Doors, an entrance to the U.S. Capitol Building. He began recording a video on his cell phone. "Charge!" he yelled. "Charge!" he yelled again, and again. He pushed forward through the crowd to the doorway, holding his phone in the air. Then, on the heels of another rioter wielding a Marine Corps flag, he galloped forward, toward a group of police, yelling "Motherfuckers!" Inside the building, Fischer and the flagpole-wielding rioter made contact with police and fell to the ground. After being helped back on his feet, Fischer did not leave, but began to talk to officers

stationed near the door. "I'm a cop too," he said, "sometimes the country is worth more than your job."

As the police attempted to clear rioters from the area, Fischer pressed up against one officer's riot shield.  He eventually ended up behind the police line before being pushed back behind the line and out the door, approximately four minutes after he had entered.  He later texted his police chief, "Got pepper sprayed to hell."

III.    **Statements After January 6**

The next day, Fischer posted the video of his charge into the Capitol on Facebook, accompanied by the following text: "Made it inside ... received pepper balls and pepper sprayed. Police line was 4 deep.. I made it to level two."  He also posted the following:

> There was some minor destruction and a few things were stolen but 98 percent peaceful. I was there. We pushed police – we pushed police back about 25 feet, got pepper balled and OC sprayed, but entry into the Capitol was needed to send a message that we, the people, hold the real power.

Describing a conversation with his police chief, Fischer posted: "I told him if that is the price I have to pay to voice my freedom and liberties which I was born with and thus taken away, then then (sic) must be the price," "I told him I have no regrets and give zero shits," and "Sometimes doing the right thing no matter how small is more important than one's own security."

Also on January 7, defendant posted photographs to Facebook that appear to depict him in Washington, D.C.  Defendant was wearing a ballistic vest underneath a red coat.  When he charged into the Capitol, he was not wearing the red coat or the ballistic vest.

On January 21, Fischer sent a message, "Yet the want peace ......fuck peace...I want an uprising.  Resistance.. too many have fought for this country and too many have died for our libertiies only to have these blind sheep try to take it all away."

### IV.     Arrest

Defendant was initially charged by complaint on February 17, 2021 with civil disorder (in violation of 18 U.S.C. § 231(a)(3)), obstruction of an official proceeding (in violation of 18 U.S.C § 1512(c)(2)) and two misdemeanors.  ECF No. 1.  The morning of February 19, the chief of the North Cornwall Township police and FBI agents went to the defendant's home to take him into custody after defendant did not answer multiple phone calls from his chief.  The police chief knocked on Fischer's door.  Fischer did not answer right away, but, when he did come outside, and was immediately confrontational, shouting obscenities.  He got within inches of the police chief's face and yelled that he had no regrets about his actions.  He continued to yell obscenities at the rest of the arrest team and assumed what one of the arresting agents described as an aggressive posture, with a puffed-up chest and his nose up against an agent's nose, before ultimately complying with orders.

Agents also asked Fischer for his cell phone.  He provided a phone, which the FBI later learned had not been in use since well before January 6.  The FBI later found the phone which Fischer had brought with him to the Capitol hidden under a bed.  The FBI also found six rifles and two pistols in Fischer's house.

As the FBI transported Fischer to the jail, he made a statement about nothing mattering after that day.  Agents asked him if he planned to harm himself, and he said no, but then said that his children were older, and it didn't matter if he was gone.  He also referred to his wife, suggesting that, even if he did harm himself, she would benefit financially.

### V.     Procedural History

On February 23, 2021, in the Middle District of Pennsylvania, Magistrate Judge Susan E. Schwab held a combined preliminary and detention hearing.  At the hearing, defendant's wife

testified that all firearms had been removed from their house, and that he did not use bows and arrows. Defense counsel followed up, "if the court imposed the condition that there be absolutely no weapons that could, you know, injure somebody, to get out of the house, you would have no problem making sure they were out of the house and that Mr. Fischer would have no access to them. Right?" Defendant's wife agreed.

Weighing the 3142(g) factors, Magistrate Judge Schwab noted that defendant was charged with serious crimes (at the time, two felonies and two misdemeanors), including a felony with a twenty-year statutory maximum. She found that the weight of the evidence was strong. She observed that defendant's history and circumstances, including a stable family, career as a police officer, and lack of criminal history or substance abuse issues, favored release, despite his behavior the day of arrest. She ultimately found that defendant's wife was a suitable custodian and that release on conditions could secure the safety of the community. Those conditions included home detention with location monitoring and a prohibition on firearms and access to social media.

At defendant's initial appearance in this district on February 25, 2021, the government requested home detention and GPS monitoring, but Magistrate Judge Meriwether imposed the standard conditions that have been ordered in many Capitol riot cases, except that she prohibited the possession of <u>all</u> firearms, destructive devices, or weapons.[1] ECF No. 10 at 2 (Condition 7(k), stating "The defendant must (k) not possess a firearm, destructive device, or other weapon"). At the time, the standard release being imposed in many Capitol riot cases conditions prohibited only the illegal possession of weapons; in this case, the court imposed a more restrictive condition. On March 19, 2021, the grand jury returned a seven-count indictment against defendant, adding a

---

[1] At the time, many defendants were being prohibited only from possessing *illegal* firearms or weapons.

felony charge under 18 U.S.C. § 111(a) for assaulting, resisting, or impeding certain officers (and aiding and abetting), in addition to the two felonies charged in the complaint.

On October 27, 2021, defense counsel contacted the government to ask its position on defendant's request to take the hunting trip and possess a bow and muzzleloader.  Defense counsel represented that Pretrial Services had advised defendant that he could not go on the hunting trip if others were possessing and using firearms.  Pretrial Services further noted its opposition, observing that defendant's compliance while on the hunting trip could not be monitored and that condition 7(k) applied equally to a bow or a muzzleloader.

Defendant has complied with his release conditions to date.

## ARGUMENT

I. **Applicable Authority**

Pursuant to 18 U.S.C. § 3142(c), if a judicial officer determines that the release described in 18 U.S.C. § 3142(b) (release on personal recognizance, or with an unsecured appearance bond) will *not* reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community, the judicial officer must order the pretrial release of the person subject to "the least restrictive further condition, or combination of conditions, that such judicial officer determines will reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(c)(1)(B).  The conditions "may include . . . [any of the thirteen possible conditions listed] or any other condition that is reasonably necessary."  *Id.*  One of the thirteen conditions listed is: "refrain from possessing a firearm, destructive device, or other dangerous weapon." *Id.* § 3142(c)(1)(B)(viii).  Thus, the Bail Reform Act permits a weapons restriction where the court finds that it (in combination with other conditions imposed) is "reasonably necessary to protect the community."

In determining appropriate conditions of release, the judicial officer considers factors including: (1) "the nature and circumstances of the offense charged," (2) "the weight of the evidence," (3) "the history and characteristics" of the defendant, and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the [defendant's] release." 18 U.S.C. § 3142(g)(1)-(4) (the "Section 3142(g) factors"). The judicial officer may amend a release order "at any time." 18 U.S.C. § 3142(c)(3).

## II. The Section 3142(g) Factors Support Restricting Defendant's Access to Weapons

The Magistrate Judge in defendant's home district and the Magistrate Judge in this district both determined that a firearms or weapons restriction was reasonably necessary in this case. For good reason: defendant aggressively charged into the Capitol, running straight at a police line. Defendant made physical contact with officers and did not back off or leave even after falling to the floor; he got up and began to argue that the officers should abandon their duty during a violent riot and pressed himself against one officer's riot shield. The incident was captured on Capitol security footage, body-worn camera, and in video from defendant's own cell phone and social media.

The government recognizes that the defendant has no criminal history, and credits him for his good conduct on release since he stormed the Capitol earlier this year. While community safety may no longer require custody or home detention in this case, the risk defendant poses has not abated so entirely that he should be allowed to possess weapons. In addition to the seriousness of the offense and the weight of the evidence, aspects of defendant's conduct suggest that his characteristics support pretrial restrictions. Defendant's text messages before January 6 suggest that he contemplated violence on January 6 and was eager to join the fight. He brought a ballistic vest with him to Washington. His messages after the riot show that he was defiant, increasing the

possibility that, having not recognized his grave error, he continues to pose a danger.  When the FBI came to arrest him, he was aggressive and belligerent toward law enforcement officers again.  Defendant's own history of service as a law enforcement officer makes his confrontations with law enforcement, both on January 6 and after, all the more alarming, suggesting a level of anger that indicates potential danger and supports restricting defendant's access to weapons pre-trial.  In addition, defendant's post-arrest statements, where he indicated that his family would be well taken care of should something happen to him, suggest that one factor that persuades many individuals to comply with the law – namely, not wanting to be separated from their loved ones – no longer held much sway over defendant.  While defendant denied that he was interested in harming himself, his statements, respectfully, raise reasonable concerns about such a possibility.

The proposed hunting trip raises several issues.  First, defendant has asked for permission to actually possess bows and muzzleloaders, which obviously qualify as weapons.  That would clearly violate condition 7(k) of defendant's release.  Second, even if defendant agrees not to possess bows and muzzleloaders (or any other weapon), the government is concerned about his participation in the hunting trip.  There will be firearms all around him, being handled by friendly family members, and defendant will be unmonitored.  The temptation to possess weapons, either actively or constructively, may simply be too great.  Any time someone puts a weapon down near the defendant, there could be a potential violation.  And, for the reasons described above, the defendant could pose some threat to the safety of himself and others if he comes into possession of a weapon.

It may theoretically be possible for defendant to go on the hunting trip without violating his pretrial release conditions, but the government has not been presented with a workable plan to ensure compliance.  Particularly given the difficulty of monitoring defendant on the trip,

moreover, a workable plan is not readily apparent. The current proposal requires placing an enormous amount of trust in the defendant to restrain himself, and defendant's conduct earlier this year casts serious doubts on his ability to do so.

Recently, Judge Amy Berman Jackson denied a misdemeanor defendant's motion to modify his conditions of release to allow him to pursue his firearm hobby. The court noted that the firearms restriction was already "the least restrictive means available," explaining that the "burden was minimal" because defendant had been denied access to firearms only during the pendency of the case. Order, *United States v. Jared Adams*, No. 21-cr-212 (ABJ), ECF No. 28, at 6 (D.D.C. July 15, 2021). Judge Jackson continued, "the temporary interference with his ability to pursue his hobby of hunting is justified and outweighed by the substantial risk to public safety." *Id.*

So too here. While the government certainly appreciates the importance of time with family, and of family traditions, Fischer has not requested access to weapons out of necessity, but to pursue a recreational activity while awaiting trial on serious charges relating to his decision to participate in the Capitol riot. And, unlike Jared Adams, who has been accused only of nonviolent misdemeanors in connection with the Capitol riot, Fischer is facing multiple felony charges, discussed the possibility of violence before January 6, and physically confronted officers inside the U.S. Capitol that day, despite being active law enforcement himself. The government had sufficient concerns here about potential danger to initially seek detention and then GPS monitoring and home detention. The court did not order those conditions, and the result is that defendant's current release conditions are relatively forgiving. The Section 3142(g) factors at least justify taking reasonable steps to limit defendant's access to weapons. That is the minimum restriction required to ensure the safety of the community.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court deny defendant's motion, that is, his request to possess weapons, or in the alternative, to engage in a recreational trip without supervision involving the use and/or possession of weapons.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:   /s/
ALEXIS J. LOEB
Assistant United States Attorney
Detailee
California Bar No. 269895
450 Golden Gate Ave, 11th Floor
San Francisco, CA 94102
Alexis.loeb@usdoj.gov
(415) 436-7168