**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA

v.

JOSEPH W. FISCHER

Defendant.

Crim. Action No. 21-234 (CJN)

**DEFENDANT'S SUPPLEMENT TO MOTION FOR TRANSFER OF VENUE**

Joseph W. Fischer, by and through his undersigned counsel, hereby respectfully submits this supplement in further support of his Motion for Transfer of Venue.[1]

Data now available confirms that significant majorities of potential jurors in the District of Columbia share materially prejudicial views of the January 6 defendants as a group, including in ways that *voir dire* is not likely to reveal or cure.

- 84% have unfavorable opinions of those arrested for participating in the January 6 demonstrations;
- 62% would characterize those individuals as criminals;

[1] As indicated in this Court's Minute Order and Entry for Proceedings held on February 28, 2022, the Court has held Mr. Fischer's Motion to Transfer Venue (ECF No. 55) in abeyance, pending a renewal or amendment by March 23, 2022. Mr. Fischer timely submits this supplement in further support of his initial Motion to Transfer, hereby renewing his request for a transfer of venue.

- 71% have already formed the opinion that these individuals are guilty; and
- 85% have already concluded that those who entered the Capitol had the specific intent to overturn the election.

In light of this and other evidence explored below, the circumstances of this case, and the characteristics of the potential jury pool in the District of Columbia, Mr. Fischer respectfully requests that the Court grant his motion for a transfer of venue pursuant to the Constitution, and/or Rule 21 of the Federal Rules of Criminal Procedure.

## I. The new data reflects surveys of potential jurors in the District of Columbia, a comparable district in the Northern District of Georgia, and a news analysis.

On behalf of all indigent clients charged in the wake of January 6, the Federal Public Defender for the District of Columbia retained the services of the professionals of Select Litigation to survey the District of Columbia jury pool. As explained in Exhibit 1 attached hereto, Select Litigation polled 400 potential District of Columbia jurors, and 400 potential jurors in the Atlanta Division of the Northern District of Georgia. In turn, Select Litigation retained the services of a media research firm, News Exposure, to analyze aspects of news coverage concerning January 6. *See* Ex. 1, with appendices.

## II. Significant majorities of potential jurors in DC have prejudged the January 6 defendants.

Select Litigation's survey of potential jurors in the District of Columbia show that significant majorities of these potential jurors have unfavorable impressions of January 6 defendants and have concluded they are guilty.

Exhibit 1 summarizes Select Litigation's findings, but highlights include that District of Columbia residents overwhelmingly:

- have unfavorable opinions of those arrested for participating in the January 6 demonstrations; and
- would characterize these individuals with broad brushes as conspiracy theorists, white supremacists, and members of violent right-wing organizations (70%, 58%, 54% respectively)

Ex. 1 ¶¶ 9, 14. These results indicate that most of the jurors will be predisposed against January 6 defendants, will likely view them as guilty of conduct other than that with which they are charged, and will likely consider them as posing a danger to the community broadly, notwithstanding the strength or weakness of the evidence that they committed the crimes charged.

Significant majorities also

- would characterize these individuals as "criminals" (62%); and
- have already formed the opinion that these individuals are "guilty" of the charges brought against them. (71%)

Ex. 1 ¶¶ 14, 10.

One would expect most respondents to report that they could not predict how they would judge a trial before it had begun, given social expectations arising from the well-known civic duty of jurors in criminal cases to not determine guilt before hearing all of the evidence. But over half of DC survey respondents were willing to *admit* that they are more likely to vote "guilty" if they find themselves on a jury in one of these cases (52%). Ex. 1 ¶ 11. The only thing that renders this unsurprising are the other results reported above – reflecting a deep prejudice against January 6 defendants.

These trends likely also explain the fact that close to four out of ten DC survey respondents – who know themselves and their fellow citizens well – would not trust a jury here to give them a fair trial if they themselves were accused of violating the law on January 6th. *See* Ex. 1 ¶ 8 (reporting that only 67% of potential DC jurors stated that they believed that they themselves would receive a fair trial if they were defendants in a January 6 case).

Further, the assessment of those respondents who claim that they believe the January 6 defendants *can* receive a fair trial is suspect. Of those who profess to believe that January 6 defendants can get a fair trial in this city, 76% have already decided that these defendants are guilty. *Id.* ¶ 12. Further, 56% of this group confess that they would be more likely to vote "guilty" if they were on a jury. *Id.*

## III. Survey results from the Northern District of Georgia are powerful evidence that District of Columbia residents are particularly unlikely to be impartial

Select Litigation's study also reinforces Mr. Fischer's argument that this District is perhaps uniquely unlikely to produce an impartial jury. There is perhaps no other place like the District of Columbia. As Select Litigation notes, it is one of the least populous federal court divisions. A significant share of its population is employed by the federal government. A very high proportion of its residents have an associate's degree or higher. Ex. 1 ¶ 21. And the ratio of Biden to Trump supporters in 2020 was more lopsided in the District of Columbia than in any other federal judicial division. Id. ¶ 22. Mr. Fischer expected that some of these factors – and others, such as the fact that DC residents were personally impacted by the both the events of January 6 and its aftermath – were bound to produce higher rates of prejudice against January 6 defendants in this district than in other districts that are comparable in other ways. Select Litigation's survey and analysis clearly supports this.

Select Litigation surveyed 400 prospective jurors in the Atlanta Division of the Northern District of Georgia, which is similar demographically to the District of Columbia. Ex. 1 ¶ 19-23. The results show that significantly fewer potential jurors there have set their minds against January 6 defendants. For example:

- 84% of DC survey respondents view people arrested in the wake of January 6th unfavorably, but only 54% of Atlanta division respondents do;
- 71% of DC respondents are of the opinion that these individuals are guilty, but only 54% of Atlanta division respondents share this opinion;
- More than half of DC respondents say they are more likely to vote "guilty" if on a jury, but fewer than half of Atlanta division respondents say this;
- 62% of DC respondents would characterize the January 6 defendants as "criminals," and well over 50% would characterize them as "white supremacists" and "members of a violent right-wing organization," whereas fewer than half of Atlanta division respondents would characterize the January 6 defendants in these three ways (48%, 40%, and 39%, respectively).

Ex. 1 ¶¶ 23, 24.

Finally, the evidence suggests that jurors in other districts are more likely to be like the Atlantans than like DC residents. Select Litigation asked both sets of survey respondents to state whether they associated those who entered the Capitol on January 6 with certain purposes, a question that had also been asked in a recent national poll recently conducted by CBS/YouGov. Ex. 1 ¶¶ 3, 18, 25.[2] The results show that potential jurors in Atlanta hold prejudicial views on this issue at similar rates as survey respondents do nationally. Id. ¶ 25. But a far greater share of potential

---

[2] The results of the poll are reviewed at https://www.cbsnews.com/news /january-6-opinion-poll-2022/ (last visited 2/4/22), and its methodology is described at https://drive.google.com/file/d/1QNzK7xBJeWzKlTrHVobLgyFtId9Cgsq_/view (last visited 3/15/22). As noted in Select Litigation's Report, the firm mirrored the wording of the CBS/YouGov poll as closely as possible to maximize the comparative value, even though Select Litigation would have used different wording. Further, differences in methodology mean the comparison is not perfect. See Ex. 1 ¶ 18.

jurors in the District of Columbia hold prejudicial views on this issue. *Id.* ¶ 25. In short, the evidence suggests that it is *this district* that is the national outlier in terms of juror prejudice, not Atlanta.

## IV. Extensive media coverage may be one of many outside influences contributing to the material prejudice reflected in the survey data

Although many defendants request a transfer of venue citing pretrial publicity, the Sixth Amendment is concerned with whether jurors' conclusions will be induced by "any outside influence" rather than "only by evidence and argument in open court[.]" *Skilling v. United States,* 561 U.S. 358, 378 (2010) (quoting *Patterson v. Colorado ex rel. Attorney General of Colo.,* 205 U.S. 454, 462 (1907) (opinion for the Court by Holmes, J.)) (emphasis added). That outside influence can be public print or "private talk." *Id.* (quoting *Patterson*, 205 U.S. at 462). It can be "the sheer number of victims." *See id.* at 437-38 (Sotomayor, J., concurring in part and dissenting in part) (quoting with approval the Fifth Circuit's statement that the district court overseeing Skilling's trial "seemed to overlook that the prejudice came from more than just pretrial media publicity, but also from the sheer number of victims"); *id.* at 437 (quoting with approval the Fifth Circuit's statement that district court lost sight of the proposition that "[t]he evaluation of the volume and nature of reporting is merely a proxy for the real inquiry: whether there could be a fair trial by an impartial jury that was not influenced by outside, irrelevant sources"). Or the improper outside influence may be the nature of the media to which jurors have been

exposed, or its prevalence close to the time to trial, or its tendency to provoke identification with those directly affected by the conduct at issue that the jurors feel a personal stake in the outcome." *Skilling,* 561 U.S. at 383 (discussing broadcast of confession in small town in *Rideau v. Louisiana*, 373 U.S. 723 (1963)); *see also United States v. McVeigh*, 918 F. Supp. 1467, 1473 (W.D. OK 1996). The outside influence may also be "such identification with a community point of view that jurors feel a sense of obligation to reach a result which will find general acceptance in the relevant audience." *McVeigh,* 918 F. Supp. at 1473.

Here, Mr. Fischer has argued in his initial Motion to Transfer Venue that the characteristics of the District's population, the direct effect of the events of January 6 on them, and the government's theory of the case are all outside influences likely to prejudice DC jurors against January 6 defendants. New evidence reinforces Mr. Fischer's argument that media coverage may be another of the outside influences contributing to the bias reflected in the survey results reported above.

*A. Videos and photos heavily featured in media about January 6 have been "of the type readers and viewers could not reasonably be expected to shut from sight," like the recorded confession in Rideau.*

Like the pretrial publicity on which the Court focused in *Rideau,* in which the Supreme Court ruled that the district court should have transferred the case to a new venue, the pretrial publicity about January 6 cases has been unforgettable and unprecedented, it has "invited prejudgment of . . . culpability," and it has been of

the "smoking gun variety." *Skilling*, 561 U.S. at 383.[3] In *Rideau,* the Court concluded that no *voir dire* could cleanse the taint of a video of the defendant's uncounseled interrogation and "interview," which had been broadcast in a small town several times before trial. *Rideau,* 373 U.S. at 727. Here, potential jurors have been exposed to hours and hours of videos of the events of January 6, and hundreds of pictures of those events. Even digital newspapers include video footage embedded in articles.

Whereas the single recording at issue in *Rideau* captured a "dramatically staged confession of guilt," *Skilling*, 561 U.S. at 382, the hundreds of January 6 videos and photos circulated over the last 13 months capture the scene of the alleged January 6 crimes, and many of the alleged crimes themselves, including potential crimes committed by many other people easily confused with Mr. Fischer. Vivid images splashed across DC papers and television for the last thirteen months show people scaling the Capitol walls, hoisting a hangman's gallows and noose, waving Confederate flags, putting their feet on the desks in the Capitol, rifling through papers on desks in the Capitol, milling about and hanging from the

[3] In *Skilling*, although the Court established no bright line rules about when media can contribute to a constitutional need to transfer venue, Justice Ginsberg noted that, when the Court has ruled that a case should have been transferred to a new venue in order to preserve defendants' constitutional right to trial by an impartial jury, it has emphasized (1) "the size and characteristics of" the district with venue, (2) the extent to which news stories about the defendant contained confessions "or other blatantly prejudicial information of the type readers or viewers" in that venue "could not reasonably be expected to shut from sight," and (3) the time that has passed between periods of significant publicity and the trial (if any has). *Skilling*, 561 U.S. at 382-83; *id*. at 381 ("[P]resumption of prejudice . . . attends only the extreme case.").

balconies in the Senate Chamber, and appearing to try to break into the House chamber, among hundreds of other scenes.[4] Many of the images – and the general impression that arises from viewing many of them – are "likely imprinted indelibly in the mind of anyone who [viewed them]," just like the recorded interrogation in Rideau would have been. *See Skilling*, 561 U.S. at 382-83. Much of this evidence has nothing to do with Mr. Fischer, but because DC jurors have been inundated with these videos, they cannot be expected to know that, or to "shut [them] from sight" during trial. *Id.* at 382.

As such, the pretrial publicity about January 6 has been "blatantly prejudicial," and distinguishable from the type of press coverage that failed to convince the majority of the Supreme Court that prejudice should be presumed in *Skilling*. *Id.* at 383 (distinguishing publicity in that case from the publicity in *Rideau* because it contained "[n]o evidence of the smoking-gun variety" and was not so shocking that it could not be shut from jurors' minds during trial).

---

[4] *See, e.g.* Staff, "No pictures, no pictures': The enduring images from Jan. 6," The Washington Post (Jan. 4, 2022), at https://www.washingtonpost.com/nation/ interactive/2022/photos-jan-6-capitol/ (last visited 3/15/22); "Chilling images from the Capitol riot: Jan. 6 insurrection in photos," *USA Today* (Jan 5. 2022), at https://www. usatoday.com/picture-gallery/news/politics/2022/01/03/jan-6-insurrection-photos-capitol-riot/9052798002/ last visited 3/15/22); D. Bennett, et al., "41 minutes of fear: A video timeline from inside the Capitol siege," *The Washington Post* (Jan. 16, 2021), at https://www.washingtonpost.com/investigations/2021/01/16/video-timeline-capitol-siege/ (last visited 3/15/22).

*B. Extensive local pretrial publicity about January 6 has not ceased in the short time that has passed between the event and upcoming trials.*

Moreover, data gathered by News Exposure at the direction of Select Litigation establishes that coverage of January 6 has been extensive and persistent, particularly in the District of Columbia. In just one year, District of Columbia newspapers have already published at least 500 articles about January 6, and local news syndicates have broadcast over 7000 stories about the day. Ex. 1 at App. B-7 (print data); App. B-1 (broadcast data).[5] This coverage is far more extensive than the coverage of the defendant that failed to persuade the Supreme Court that it should presume prejudice in *Skilling. See Skilling,* 561 U.S. at 428-30 (Sotomayor, J., concurring in part and dissenting in part) (noting that it took multiple years between Enron's collapse and trial for there to accumulate hundreds of Houston Chronicle articles, and 1,600 local broadcast stories about Skilling).[6]

Select Litigation also asked News Exposure to analyze coverage of January 6 in the Atlanta division of the Northern District of Georgia, which is similar demographically to the District of Columbia. Ex. 1 ¶¶ 27-32. Comparison of

[5] These estimates may understate coverage of January 6, as News Exposure only counted hits containing a short list of terms: "January 6 riot" or "Capitol insurrection" or "Capitol riot" or "2021 US Capitol attack" or "Capitol violence." The Washington, DC newspapers News Exposure considered were The Washington Post, The Washington Times, and Washington Examiner.

[6] While most of the coverage, particularly the recent coverage, has not focused on Mr. Fischer, his concern is that he will be prejudiced by his association with an event and a group of thousands that have been covered as a group incessantly – and negatively – by various news media in the last year, both nationally and locally.

coverage in this District to coverage in Atlanta reinforces how persistent coverage has been in the District of Columbia. For example, in the month where January 6 was covered least by local D.C. broadcast affiliates (August of 2021), January 6 was still mentioned more than it had been in Atlanta in nine of the 12 months evaluated. Ex. 1 ¶ 30; id. at App. B-1, B2. The data also shows that District of Columbia print, broadcast, and web coverage of January 6 has exceeded Atlanta's equivalent's almost every month, and has far surpassed Atlanta's coverage over the last year as a whole. Ex. 1, App. B. Indeed, for every story about January 6 in the *Atlanta Journal-Constitution* since January of 2021, there have been at least two in *The Washington Post*. Ex. 1 ¶ 28.

In short, the data shows that District residents have been exposed to an enormous amount of coverage of January 6, and more local coverage of January 6 than residents of a comparable district have, thereby reinforcing the point that January 6 is a local story in addition to being a national story, and Mr. Fischer will have a harder time seating an impartial jury in this district than in others.

## V. The data and other circumstances provide ample grounds to transfer.

The concept of presumption of prejudice is predicated on the idea that the institution of the jury is occasionally fallible. Of course, jurors are almost always trusted to represent their views wholly and accurately during *voir dire*, and to follow the court's instructions if selected for the jury. But the Supreme Court has

recognized that a failsafe may be needed under a narrow set of conditions that make it more difficult for a juror to accurately assess their own bias, or to ignore salient community attitudes about the case. *See Rideau*, 373 U.S. at 727 (concluding that no review of "the *voir dire* examination of the members of the jury" was necessary to determine in that case that "that due process of law. . . required a [transfer]"); *see also, e.g., Murphy v. Florida,* 421 U.S. 794, 802 (1975) ("Even these indicia of impartiality [during *voir dire*] might be disregarded in a case where the general atmosphere in the community or courtroom is sufficiently inflammatory."); *Irvin v. Dowd*, 366 U.S. 717, 728 (1961) ("No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but psychological impact requiring such a declaration before one's fellows [during *voir dire]* is often its father.").

Common sense suggests that the circumstances of January 6, the small size of this district, its many federal employees, the aftermath of January 6, the political makeup of DC coupled with the government's theory of the case, and the persistent news coverage of the events in this news- and politics-obsessed city make this venue uniquely unlikely to produce an impartial jury as the Constitution demands. Data Mr. Fischer now submits confirms that there are extremely high levels of prejudice among potential jurors in this district, whether due to the influence of the factors above, particularly high levels of pretrial publicity, or all of the above. To a

remarkable and standout degree, most potential jurors here have already made up their minds that the January 6 defendants are criminals, that they are guilty generally, and that they are guilty specifically of seeking to stop the counting of the electoral votes. They know that their friends and family have as well. Many do not even realize that they have already prejudged essential elements of the government's case. As a result, even those striving to be honest during *voir dire*, and striving to meet their obligations as jurors, would nevertheless remain partial in ways that *voir dire* could not reveal.

Under these extreme circumstances, prejudice must be presumed, and the Court should transfer this case to another venue to preserve Mr. Fischer's rights under the Constitution, or at least pursuant to the Court's discretion under Rule 21 of the Rules of Criminal Procedure. *See Skilling,* 561 U.S. at 446 n.9 (Sotomayor, J., concurring in part and dissenting in part) (noting that district courts have wide discretion to transfer a case to another venue even if trial in the originating venue would not violate the Constitution, and that it would not have been imprudent to transfer the Skilling case given "the widely felt sense of victimhood among Houstonians and the community's deep-seated animus toward Skilling" even if these issues did not preclude a constitutional trial).

No trial date for Mr. Fischer has been set yet. The District has already held its first January 6 trial, *United States v Reffitt,* Criminal No. 1:21-cr-32-DLF,

which garnered considerable media attention and resulted in verdicts of guilty on all counts. By the time Mr. Fischer goes to trial, other January 6 defendants likely will have gone to trial before him. This means the already-small pool of even potentially eligible jurors will shrink, and pretrial publicity will likely experience other spikes as trials are conducted and verdicts returned. As such, the list of reasons for the Court to presume prejudice will only grow in the time between now and Mr. Fischer's trial. To ensure that Mr. Fischer is tried by an impartial jury, the Court should transfer this case to another suitable venue as soon as possible.

Date: March 22, 2022

Respectfully submitted:

*/s/ Lori J. Ulrich*
LORI J. ULRICH, ESQUIRE
Assistant Federal Public Defender
*/s/ Amanda R. Gaynor*
AMANDA R. GAYNOR, ESQUIRE
Staff Attorney
100 Chestnut Street, Suite 306
Harrisburg, PA 17101
Tel. No. (717) 782-2237
Fax No. (717) 782-3881
*lori_ulrich@fd.org*
*amanda_gaynor@fd.org*

*/s/ Eugene Ohm*
EUGENE OHM, ESQUIRE
Federal Public Defender
625 Indiana Avenue, NW
Washington, D.C. 20004
Tel. No. (202) 208-7500
*eugene_ohm@fd.org*

*Attorneys for Joseph W. Fischer*

## CERTIFICATE OF SERVICE

I, Lori J. Ulrich, Esquire, of the Federal Public Defender's Office, do hereby certify that I served a copy of the foregoing **Defendant's Supplement to Motion for Transfer of Venue** via Electronic Case Filing, and/or by placing a copy in the United States mail, first class in Harrisburg, Pennsylvania, and/or by hand delivery, addressed to the following:

Alexis Jane Loeb, Esquire
Assistant United States Attorney
a*lexis.loeb@usdoj.gov*

JOSEPH W. FISCHER

Date: March 22, 2022

*/s/ Lori J. Ulrich*
LORI J. ULRICH, ESQUIRE
Assistant Federal Public Defender
Attorney ID #55626
100 Chestnut Street, Suite 306
Harrisburg, PA 17101
Tel. No. (717) 782-2237
Fax No. (717) 782-3881
lori_ulrich@fd.org
*Attorney for Riley June Williams*