**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | **CASE NO. 21-cr-234 (CJN)** |
| **v.** | **:** | |
| | **:** | |
| **JOSEPH W. FISCHER,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

**<u>GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO TRANSFER
VENUE</u>**

# TABLE OF CONTENTS

BACKGROUND .................................................................................................................. 1

ARGUMENT ...................................................................................................................... 3

    I.  The District of Columbia's Political Makeup Does Not Support a Presumption of
        Prejudice. ........................................................................................................ 3

    II.  The Impact of January 6 on Washington D.C. Does Not Support a Presumption of
        Prejudice. ........................................................................................................ 7

    III.  The Number of Federal Employees Who Reside in the District of Columbia Does Not
        Support a Presumption of Prejudice. ........................................................... 8

    IV.  The Select Litigation Poll Does Not Support a Presumption of Prejudice. .................... 9

        A.  Courts have repeatedly declined to find a presumption of prejudice based on pretrial
           polling without conducting voir dire.......................................................... 9

        B.  The Select Litigation poll does not demonstrate pervasive prejudice in the District of
           Columbia ................................................................................................... 12

    V.  The Select Litigation Media Analysis Does Not Support a Presumption of Prejudice... 18

    VI.  The Pretrial Publicity Related to January 6 Does Not Support a Presumption of
        Prejudice in This District. ........................................................................... 20

        A.  Size and characteristics of the community............................................... 23

        B.  Nature of the pretrial publicity ................................................................. 23

        C.  Passage of time before trial...................................................................... 28

        D.  The jury verdict........................................................................................ 28

    VII.  Recent Trials in this District Do Not Support Defendant's Request to Transfer.......... 29

    VIII.  Fischer Fails to Show that the Middle District of Pennsylvania is a Suitable
        Alternative Venue....................................................................................... 30

    IX.  A Jury Questionnaire Is Not Necessary in This Case .................................................. 32

CONCLUSION.................................................................................................................. 33

# TABLE OF AUTHORITIES

## Federal Cases

*Connors v. United States*, 158 U.S. 408 (1895) ............................................................. 5

*Estes v. Texas*, 381 U.S. 532 (1965) .................................................................. 21

*Gentile v. State Bar of Nev.*, 501 U.S. 1030 (1991) .................................... 23

*Henderson v. Dugger*, 925 F.2d 1309 (11th Cir. 1991) ................................. 24

*In re Tsarnaev*, 780 F.3d 14 (1st Cir. 2015) ....................................... 7, 9, 22

*Irvin v. Dowd,* 366 U.S. 722 (1961) ........................................... 11, 17, 21

*Jones v. Gasch*, 404 F.2d 1231 (D.C. Cir. 1967) ........................................ 3

*Morgan v. Illinois*, 504 U.S. 719 (1992) ............................................... 3

*Murphy v. Florida*, 421 U.S. 794 (1975) ............................................. 20

*Murray v. Schriro*, 882 F.3d 778 (9th Cir. 2018) ...................................... 24

*Mu'Min v. Virginia*, 500 U.S. 415 (1991) .................................... 9, 23, 32

*Nebraska Press Ass'n v. Stuart*, 427 U.S. 539 (1976) ................................. 21

*Patton v. Yount*, 467 U.S. 1025 (1984) ........................................... 17, 20

*Reynolds v. United States*, 98 U.S. 145 (1878) ..................................... 21

*Rideau v. Louisiana*, 373 U.S. 723 (1963) .................................... passim

*Rosales-Lopez v. United States*, 451 U.S. 182 (1981) ........................... 12, 32

*Sheppard v. Maxwell*, 384 U.S. 333 (1966) ..................................... 21, 24

*Skilling v. United States*, 561 U.S. 358 (2010) ............................... passim

*United States v. Alford,* No. 21-cr-263 (TSC), ECF No. 46 (D.D.C. Apr. 18, 2022) ............1, 4, 9

*United States v. Barry*, 938 F.2d 1327 (D.C. Cir. 1991) ........................... 6

*United States v. Brooks,* No. 21-cr-503 (RCL), ECF No. 31 (D.D.C. Jan. 24, 2022) .............1, 31

*United States v. Bochene,* No. 21-cr-418 (RDM), 2022 WL 123893 (D.D.C. Jan. 12, 2022) .................................................................................................... 1, 8, 26

*United States v. Caldwell*, 21-cr-28 (APM), ECF No. 415 (D.D.C. Sept. 14, 2021) ....................1

*United States v. Campa*, 459 F.3d 1121 (11th Cir. 2006) ................................. 3, 10, 11

*United States v. Causey*, 2005 WL 8160703 (S.D. Tex. 2005) ..................................... 9

*United States v. Chapin*, 515 F.2d 1274 (D.C. Cir. 1975) ..................................... 4, 31

*United States v. Childress*, 58 F.3d 693 (D.C. Cir. 1995) ..................................... 20

*United States v. Cores*, 356 U.S. 405 (1958) ..................................... 3

*United States v. Edmond*, 52 F.3d 1080 (D.C. Cir. 1995) ..................................... 26

*United States v. Griffin,* No. 21-cr-92 (TNM) (D.D.C. March 22, 2022)..................... 29

*United States v. Haldeman*, 559 F.2d 31 (D.C. Cir. 1976) ..................................... passim

*United States v. Jackson*, 863 F. Supp. 1449 (D. Kan. 1994) ..................................... 32

*United States v. Libby*, 498 F. Supp. 2d 1 (D.D.C. 2007) ..................................... 6

*United States v. Lorenzana-Cordon,* No. 03-cr-331, 2016 WL 11664054 (D.D.C. Feb. 22, 2016) ..................................... 32

*United States v. Martin*, No. 21-cr-394 (TNM) (D.D.C. Apr. 6, 2022)..................... 29

*United States v. McVeigh*, 918 F. Supp. 1467 (W.D. Okla. 1996) ..................................... 6, 31

*United States v. Moussaoui*, 43 F. App'x 612 (4th Cir. 2002) ..................................... 7, 22

*United States v. North*, 910 F.2d 843 (D.C. Cir. 1990) ..................................... 6

*United States v. Petters*, 663 F.3d 375 (8th Cir. 2011) ..................................... 22

*United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991) ..................................... 6

*United States v. Rodriguez*, 581 F.3d 775 (8th Cir. 2009) ..................................... 10, 11

*United States v. Stone,* No. 19-cr-0018 (ABJ), 2020 WL 1892360 (D.D.C. Apr. 6, 2020) .... 6, 32

*United States v. Webster*, 21-cr-208 (APM), ECF 78 (D.D.C. Apr. 18, 2022) ............ 1, 9, 18, 26

*United States v. Yousef*, 327 F.3d 56 (2d Cir. 2003) ..................................... 7, 22

### Federal Statutes

18 U.S.C. § 111 ..................................... 2

18 U.S.C. § 231 ..................................... 2

18 U.S.C. § 1512 ..................................... 2

18 U.S.C. § 1752 ..................................... 2

18 U.S.C. § 2383 ..................................... 18

18 U.S.C. § 2385 ..................................... 18

40 U.S.C. § 5104 ..................................... 2

**Rules**

Fed. R. Crim. P. 21  .................................................................................................. 1, 3

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S
## MOTION TO TRANSFER VENUE

Defendant Joseph W. Fischer, who is charged in connection with events at the U.S. Capitol on January 6, 2021, originally moved to transfer venue in this case to the Harrisburg Division of the Middle District of Pennsylvania (ECF No. 55), and, in renewing his motion, seeks transfer to "another suitable venue."  ECF No. 66 at 15.  Fischer fails to establish that he "cannot obtain a fair and impartial trial" in this district, Fed. R. Crim. P. 21(a), and this Court should deny his motion. Other judges of the Court have rejected similar requests.  *United States v. Caldwell*, 21-cr-28, ECF No. 415 (APM) (D.D.C. Sept. 14, 2021); *United States v. Bochene*, No. 21-cr-418 (RDM), 2022 WL 123893 (D.D.C. Jan. 12, 2022); *United States v. Brooks*, No. 21-cr-503 (RCL), ECF No. 31 (D.D.C. Jan. 24, 2022); *United States v. Webster,* No. 21-cr-208 (APM), ECF No. 78 (D.D.C. Apr. 18, 2022); *United States v. Alford,* 21-cr-263 (TSC), ECF No. 46 (D.D.C. Apr. 18, 2022).

## BACKGROUND

On January 6, 2021, a Joint Session of the United States House of Representatives and the United States Senate convened to certify the vote of the Electoral College of the 2020 U.S. Presidential Election.  While the certification process was proceeding, a large crowd gathered outside the United States Capitol, entered the restricted grounds, and forced entry into the Capitol building.  As a result, the Joint Session and the entire official proceeding of the Congress was halted until law enforcement was able to clear the Capitol of hundreds of unlawful occupants and ensure the safety of elected officials.

Fischer, a resident of the Middle District of Pennsylvania, traveled to Washington, D.C. on or about January 6.  During the riot at the U.S. Capitol, he charged through the Rotunda Doors at a police line and, along with officers, fell to the ground.  After being helped back to his feet, Fischer

spoke heatedly to officers in the area, saying that he was also a police officer, and that "sometimes the country is worth more than your job." He then pressed himself against an officer's riot shield and then ended up behind the police line before being pushed out the door. He later commented, "We pushed police back about 25 feet, got pepper balled and OC sprayed, but entry into the Capitol was needed to send a message that we the people hold the real power." Based on his actions on January 6, 2021, the defendant was charged with civil disorder, in violation of 18 U.S.C. § 231(a)(3) (Count One); assaulting, resisting, or impeding certain officers, in violation of 18 U.S.C. § 111(a)(1) (Count Two); obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2) (Count Three); entering or remaining on restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count Four); disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count Five); disorderly conduct in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Six); and parading, demonstrating, or picketing in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Seven). ECF No. 52.  The Court dismissed Count Three on March 15, 2022, although the government has moved for reconsideration.  ECF Nos. 65, 72.

Fischer moved for a change of venue on January 12, 2022 and, with the Court's permission, supplemented his motion on March 25, 2022.  ECF Nos. 55, 66.  He contends that prejudice should be presumed in this district for six primary reasons: (1) the number of federal employees living and working with the District of Columbia, (2) the political makeup of the District of Columbia jury pool; (3) the impact of January 6 on Washington, D.C., (4) the results of a survey conducted by Select Litigation, (5) the results of a media analysis conducted by Select Litigation, and (6) pretrial publicity surrounding the events of January 6.  Each of the defendant's arguments is without merit, and the motion should be denied.

**ARGUMENT**

The Constitution provides that "[t]he trial of all Crimes . . . shall be held in the State where the said Crimes shall have been committed." U.S. Const. Art. III, § 2, cl. 3. The Sixth Amendment similarly guarantees the right to be tried "by an impartial jury of the State and district wherein the crime shall have been committed." U.S. Const. amend. VI. These provisions provide "a safeguard against the unfairness and hardship involved when an accused is prosecuted in a remote place." *United States v. Cores*, 356 U.S. 405, 407 (1958). Transfer to another venue is constitutionally required only where "extraordinary local prejudice will prevent a fair trial." *Skilling v. United States*, 561 U.S. 358, 378 (2010); *see* Fed. R. Crim. P. 21(a) (requiring transfer to another district if "so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there").

The primary safeguard of the right to an impartial jury is "an adequate voir dire to identify unqualified jurors." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992) (italics omitted). Thus, the best course when faced with a pretrial publicity claim is ordinarily "to proceed to voir dire to ascertain whether the prospective jurors have, in fact, been influenced by pretrial publicity." *United States v. Campa*, 459 F.3d 1121, 1146 (11th Cir. 2006) (en banc). "[I]f an impartial jury actually cannot be selected, that fact should become evident at the voir dire." *United States v. Haldeman*, 559 F.2d 31, 63 (D.C. Cir. 1976) (en banc) (per curiam). And, after voir dire, "it may be found that, despite earlier prognostications, removal of the trial is unnecessary." *Jones v. Gasch*, 404 F.2d 1231, 1238 (D.C. Cir. 1967).

**I.      The District of Columbia's Political Makeup Does Not Support a Presumption of Prejudice.**

The defendant contends that he cannot obtain a fair trial in the District of Columbia because more than 90% of its voters voted against Donald Trump in the 2020 Presidential Election. ECF

No. 55 at 4.  The en banc D.C. Circuit rejected a nearly identical claim in *Haldeman*, where the dissent concluded that a venue change was required because "Washington, D.C. is unique in its overwhelming concentration of supporters of the Democratic Party" and the Democratic candidate received 81.8% and 78.1% of the vote when Nixon ran for President in 1968 and 1972, respectively.  *Haldeman*, 559 F.2d at 160 (MacKinnon, J., concurring in part and dissenting in part).  The majority rejected the relevance of this fact, observing that authority cited by the dissent gave no "intimation that a community's voting patterns are at all pertinent to venue."  *Id.* at 64 n.43; *see also United States v. Chapin*, 515 F.2d 1274, 1286 (D.C. Cir. 1975) (rejecting the argument that "because of [the defendant's] connection with the Nixon administration and his participation in a 'dirty tricks' campaign aimed at Democratic candidates and with racial overtones, a truly fair and impartial jury could not have been drawn from the District's heavily black, and overwhelmingly Democratic, population").  In *Haldeman*, moreover, an overwhelming percentage of the potential jurors in that case had heard of the defendants and their crimes and 84% of those individuals had formed an opinion of the defendants' guilt.  *Haldeman*, 559 F.2d at 144.

If "the District of Columbia's voting record in the past two presidential elections" is not "at all pertinent to venue" in a case involving high-ranking members of a presidential administration, *Haldeman*, 559 F.2d at 64 n.43, it cannot justify a change of venue here.  Fischer "does not indicate what percentage of District residents actually voted in the 2020 election, so his emphasis on voters excludes many potential jurors who may not closely follow politics."  *Alford*, 21-cr-263, ECF 46 at 6.  To be sure, some potential jurors might be unable to be impartial in January 6 cases based on disagreement with the defendants' political aims.  But whether individual prospective jurors have such disqualifying biases can be assessed during voir dire.  This Court

4

should not presume that every member of a particular political party is biased simply because this case has a political connection.[1]  Indeed, the Supreme Court has stated in the context of an election-fraud trial, that "[t]he law assumes that every citizen is equally interested in the enforcement of the statute enacted to guard the integrity of national elections, and that his political opinions or affiliations will not stand in the way of an honest discharge of his duty as a juror in cases arising under that statute."  *Connors v. United States*, 158 U.S. 408, 414 (1895).  The same is true here. The District's voting record does not establish that this Court will be unable to select "an unbiased jury capable of basing its verdict solely on the evidence introduced at trial," *Haldeman,* 559 F.2d at 70.

Fischer also claims that the existence of anti-Trump protests in Washington, D.C. is further evidence that the jury pool is prejudiced against him.  ECF No. 55 at 5.  He does not provide any estimate of the number of people (let alone D.C. residents) who participated in the protests, and he does not establish that a non-negligible percentage of the jury pool has been tainted by their participation.  Nor does he acknowledge that (a) large pro-Trump demonstrations that also occurred in the District or (b) some anti-Trump protests, such as protests surrounding President Trump's 2016 election, were nationwide events.[2]  To the extent that Fischer is arguing that mere exposure to anti-Trump protests tainted the jury pool, that argument fails: it is unsupported by evidence, and Washington, D.C., is home to all manner of protests on any number of issues;

---

[1] And, in fact, party membership in the District is more divided than Fischer's focus on the recent presidential election results indicates: 59% percent of District residents reported that they consider themselves Democrats, while the other 41% reported that they consider themselves to be Independents, Republicans, other, or that they did not know.  ECF 66-1, at 16 (Q12).

[2] *See* "Anti-Trump protests, some violent, erupt for 3rd night nationwide," *available at https://www.usatoday.com/story/news/nation/2016/11/11/anti-trump-protesters-pepper-sprayed-demonstrations-erupt-across-us/93633154* (last visited April 6, 2022) (noting demonstrations in Pennsylvania, Florida, Ohio, Minnesota, Oregon, Wisconsin, New York, California, Colorado, Kentucky, and Texas).

protests are a part of the daily fabric of life in Washington, D.C..  If anything, they are less likely to affect potential jurors in the District than elsewhere.

As the nation's capital and seat of the federal government, the District has been home to its fair share of trials in politically charged cases.  High-profile individuals strongly associated with a particular party, such as Marion Barry, John Poindexter, Oliver North, Scooter Libby, and Roger Stone, have all been tried in the District.  *See United States v. Barry*, 938 F.2d 1327 (D.C. Cir. 1991); *United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991); *United States v. North*, 910 F.2d 843 (D.C. Cir. 1990) (per curiam); *United States v. Libby*, 498 F. Supp. 2d 1 (D.D.C. 2007); *United States v. Stone*, No. 19-cr-0018 (ABJ), 2020 WL 1892360 (D.D.C. Apr. 16, 2020). Indeed, the Court in Stone rejected the argument that jurors "could not possibly view [Roger Stone] independently from the President" because of his role in the presidential campaign or that "if you do not like Donald Trump, you must not like Roger Stone."  2020 WL 1892360, at *30-31. Similarly here, the fact that most District residents voted against Donald Trump does not mean those residents could not impartially consider the evidence against those charged in connection with the events on January 6.

Moreover, Fischer's argument relies on the flawed premise that opposition to Donald Trump equates with bias against Joseph Fischer that cannot be set aside.  Joseph Fischer, not Donald Trump, is the individual charged in this case.  And Fischer is not charged with supporting Trump; he is charged with civil disorder and with assaulting, resisting, or impeding federal officers, among other violations.  As explained further below, defendant cites precedent where substantial negative publicity concerned the defendant himself.  *See, e.g.*, ECF No. 55 at 3; ECF No. 66 at 8 (citing *United States v. McVeigh*, 918 F. Supp. 1467, 1470 (W.D. Okla. 1996)).  That is not the case here.

II.     **The Impact of January 6 on Washington D.C. Does Not Support a Presumption of Prejudice.**

Fischer contends that a D.C. jury could not be impartial because D.C. residents have been particularly affected by events surrounding January 6, including the deployment of the National Guard, the mayor's declaration of a state of emergency, road closures, and a curfew (which was for one night, not "weeks," as Fischer claims).[3]  ECF No. 55 at 5-6.  But January 6, and these restrictions, are now more than a year in the past; by the time Fischer's trial takes place (no date has yet been set), more time will have passed.  Fischer's references to the one-year anniversary of the attack (ECF No. 55 at 8), perhaps timely when his original motion was filed, are already less relevant now, and will be even less so when his trial takes place.  Many D.C. residents do not live or work near the Capitol where the roads were closed and the National Guard was deployed.  There is no reason to believe that the District's entire population of 700,000 people was so affected by these events that the Court cannot seat an impartial jury here.

Indeed, courts routinely conclude that defendants can receive a fair trial in the location where they committed their crimes, despite the fact that some members of the community were victimized.  *See In re Tsarnaev*, 780 F.3d 14, 15 (1st Cir. 2015) (Boston Marathon bombing); *Skilling*, 561 U.S. at 399 (Enron collapse); *United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003) (1993 World Trade Center bombing); *United States v. Moussaoui*, 43 F. App'x 612, 613 (4th Cir. 2002) (per curiam) (unpublished) (September 11, 2001 attacks, including on the Pentagon).  In

---

[3] Press Release, Mayor Muriel Bowser, January 6, 2021, *https://mayor.dc.gov/release/mayor-bowser-orders-citywide-curfew-beginning-6pm-today#:~:text=(Washington%2C%20DC)%20%E2%80%93%20Today,am%20on%20Thursday%2C%20January%207 (last visited April 6, 2022)*.  The order cited by Fischer extended the public emergency for 15 days, and mentioned the possibility of a curfew, but did not order one. Press Release, Mayor Muriel Bowser, January 6, 2021*, https://mayor.dc.gov/release/mayor-bowser-issues-mayor%E2%80%99s-order-extending-today%E2%80%99s-public-emergency-15-days-a1* (last visited April 6, 2022).

*Skilling*, the Supreme Court rejected the contention that Enron's "sheer number of victims" in the Houston area "trigger[ed] a presumption of prejudice." *Skilling*, 561 U.S. at 384 (quotation omitted). "Although the widespread community impact necessitated careful identification and inspection of prospective jurors' connections to Enron," the voir dire was "well suited to that task." *Id.* In this case too, voir dire can adequately identify those D.C. residents who were so affected by January 6 that they cannot impartially serve as jurors. There is no reason to presume prejudice.

### III.   The Number of Federal Employees Who Reside in the District of Columbia Does Not Support a Presumption of Prejudice.

In his supplemental motion, Fischer notes that a "significant share" of the District of Columbia's population works for the federal government. ECF No. 66 at 5. But he does not explain how merely being employed by the federal government would render a person incapable of serving as an impartial juror. Although some federal employees, such as the U.S. Capitol Police, were affected by the events of January 6, many others were neither directly nor indirectly affected. Indeed, many federal employees were nowhere near the Capitol on January 6 given the maximum telework posture at the time. And the storming of the Capitol on January 6 was not aimed at the federal government in general, but specifically at Congress' certification of the electoral vote. There is therefore no reason to believe that federal employees with little or no connection to the events at the Capitol could not be impartial in this case. *See Bochene*, 2022 WL 123893, at *2 (January 6 defendant's claim that federal employees would "have a vested interest in supporting their employer" was "exactly the kind of conjecture that is insufficient to warrant transfer prior to jury selection").[4]

---

[4] Even assuming (incorrectly) that every federal employee is affected by improper bias, the Court could draw a jury from those District residents who are not employed by the federal government. According to the Office of Personnel Management, around 141,000 non-Postal Service employees worked in Washington, D.C., in 2017. OPM, Federal Civilian Employment, available at

IV.     **The Select Litigation Poll Does Not Support a Presumption of Prejudice.**

Fischer also relies on a poll conducted by Select Litigation, a private litigation consulting firm, at the request of the Federal Public Defender for the District of Columbia.  ECF No. 66-1.  Select Litigation conducted a telephone poll of potential jurors in the District of Columbia and in the Atlanta Division of the Northern District of Georgia and contracted with a media research firm to analyze news media coverage of January 6 in both of those jurisdictions.  At least two judges have found that this same survey does not establish a presumption of prejudice.  *Webster,* 21-cr-208, ECF No. 78 at 2; *Alford,* 21-cr-263, ECF No. 46 at 6-11.  The government further addresses the survey below.

A.     **Courts have repeatedly declined to find a presumption of prejudice based on pretrial polling without conducting voir dire**

Fischer argues that this Court should find a presumption of prejudice based on the results of a Select Litigation poll of prospective jurors.  But "courts have commonly rejected such polls as unpersuasive in favor of effective voir dire as a preferable way to ferret out any bias."  *United States v. Causey*, 2005 WL 8160703, at *7 (S.D. Tex. 2005).  As one circuit has observed, the Supreme Court's emphasis on the important role of voir dire in addressing pretrial publicity "undercuts" the "argument that poll percentages . . . decide the question of a presumption of prejudice."  *In re Tsarnaev*, 780 F.3d 14, 23 (1st Cir. 2015) (per curiam); *see Mu'Min v. Virginia*, 500 U.S. 415, 427 (1991) (observing that, "[p]articularly with respect to pretrial publicity, . . . primary reliance on the judgment of the trial court makes good sense").

---

https://www.opm.gov/policy-data-oversight/data-analysis-documentation/federal-employment-reports/reports-publications/federal-civilian-employment/.   But many federal employees who work in the District live outside the District and would not be part of the jury pool.  And the District has approximately 700,000 residents.  Thus, even if every federal employee were disqualified, the Court would be able to pick a jury in this District.

Indeed, the D.C. Circuit has rejected a claim of presumed prejudice based on the results of a pre-voir dire survey. *Haldeman*, 559 F.2d at 64. In *Haldeman*, seven former Nixon administration officials (including the former Attorney General of the United States) were prosecuted for their role in the Watergate scandal. *Id.* at 51. According to a poll commissioned by the defense in that case, 93% of the Washington, D.C. population knew of the charges against the defendants and 61% had formed the opinion that they were guilty. *Id.* at 144, 178 n.2 (MacKinnon, J., concurring in part and dissenting in part). Recognizing that the case had produced a "massive" amount of pretrial publicity, *Id.* at 61, the D.C. Circuit nevertheless held that the district court "was correct" to deny the defendants' "pre-voir dire requests for . . . a change of venue," *Id.* at 63-64. The court observed that the district court "did not err in relying less heavily on a poll taken in private by private pollsters and paid for by one side than on a recorded, comprehensive voir dire examination conducted by the judge in the presence of all parties and their counsel." *Id.* at 64 n.43.

Other circuits have similarly rejected attempts to elevate polling results over voir dire. In *United States v. Campa*, a pre-trial survey found that 69% of respondents were prejudiced against anyone charged with spying on behalf of Cuba, as the defendants were. *Campa*, 459 F.3d at 1157 (Birch, J., dissenting). The en banc Eleventh Circuit affirmed the denial of a motion for change of venue away from Miami, explaining that "[w]hen a defendant alleges that prejudicial pretrial publicity would prevent him from receiving a fair trial, it is within the district court's broad discretion to proceed to voir dire to ascertain whether the prospective jurors have, in fact, been influenced by pretrial publicity." *Id.* at 1146 (majority opinion).

Similarly, in *United States v. Rodriguez*, 581 F.3d 775 (8th Cir. 2009), a poll indicated that 99 percent of respondents had heard about the brutal rape and murder with which the defendant

was charged, nearly 88 percent of those respondents believed he was guilty, and about 42 percent of respondents had a strongly held opinion of his guilt. *Id.* at 786; Brief for the Appellant, *United States v. Rodriguez*, No. 07-1316 (8th Cir.), 2008 WL 194877, at *19. Nonetheless, the Eighth Circuit found no presumption of prejudice, observing that a district court was not required "to consider public opinion polls when ruling on change-of-venue motions." *Rodriguez*, 581 F.3d at 786. And the court held that, in any event, the poll did not "demonstrate widespread community prejudice" because the "media coverage had not been inflammatory," two years had passed since the murder, and "the district court concluded that special voir dire protocols would screen out prejudiced jurors." *Id.*

There are good reasons to rely on voir dire, rather than public-opinion polls (let alone a phone survey commissioned by one party), when assessing whether prejudice should be presumed. First, polling lacks many of the safeguards of court-supervised voir dire, including the involvement of both parties in formulating the questions. Surveys that are not carefully worded and properly conducted can produce misleading results, such as by asking leading questions or providing the respondents with facts that will influence their responses. *See Campa*, 459 F.3d at 1146 (noting problems with "non-neutral" and "ambiguous" questions). Second, polling lacks the formality that attends in-court proceedings under oath, and it does not afford the court the "face-to-face opportunity to gauge demeanor and credibility." *Skilling*, 561 U.S. at 395. Third, polls ordinarily inform the court only the extent to which prospective jurors have heard about a case and formed an opinion about it. But that is not the ultimate question when picking a jury. A prospective juror is not disqualified simply because he has "formed some impression or opinion as to the merits of the case." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). Instead, "[i]t is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.*

at 723.  But pre-trial surveys are poorly suited to answering that ultimate question, which is best asked in the context of face-to-face voir dire under oath.  *See Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981) (observing that the trial judge's function in voir dire "is not unlike that of the jurors later in the trial" because "[b]oth must reach conclusions as to impartiality and credibility by relying on their own evaluations of demeanor evidence and of responses to questions").

In sum, federal courts have shown an overwhelming preference for assessing prejudice through court-supervised voir dire rather than through public opinion polls.  And the defendant has not offered any reason to depart from that usual practice here.  Thus, this Court need not give substantial weight to the polling when considering whether to presume prejudice.  But, as explained below, the Select Litigation poll does not support a presumption of prejudice in any event.

### B.     The Select Litigation poll does not demonstrate pervasive prejudice in the District of Columbia

Contrary to Fischer's contention, the Select Litigation poll does not support a presumption of prejudice in this District.  As an initial matter, the Select Litigation poll selected only one comparator jurisdiction—the Atlanta Division of the Northern District of Georgia.  Fischer (at least initially) did not request a transfer to that district or division, but instead asked this Court for a transfer to the Middle District of Pennsylvania.  The Select Litigation survey tells the Court nothing about the views or media exposure of prospective jurors in that district.  The poll therefore cannot show that selecting an impartial jury would be any more difficult in the District of Columbia than in the defendant's preferred district.  *See Haldeman*, 559 F.2d at 64 n.43 (observing that a change of venue "would have been only of doubtful value" where the pretrial publicity was national in scope).

Furthermore, to the extent the poll is useful at a more general level in comparing the District

of Columbia to other districts, the poll indicates that levels of media exposure to the events of January 6 are not significantly different in Atlanta than in Washington, D.C.  The number of respondents who had seen "[a] lot" of coverage in each jurisdiction differed only by three percentage points (33% in D.C. versus 30% in Atlanta), which is within the margin of error.  ECF No. 66-1 at 15 (Question 8).  The number of respondents who had seen "[s]ome" coverage was exactly the same (25% in both jurisdictions), and the number who had seen "[q]uite a bit" of coverage was not significantly different (28% in D.C. versus 20% in Atlanta).  *Id.*  The total percentage of respondents who were exposed to "[a] lot," "[q]uite a bit," or "[s]ome" news coverage was 86% in Washington, D.C. and 75% in Atlanta.  *Id.*  This relatively small difference does not suggest that news coverage has made it impossible to pick an impartial jury in Washington, D.C.

The defendant repeatedly points out (ECF No. 66 at 2, 3, 6) that 71% of respondents in D.C. said they had formed the opinion January 6 arrestees were "guilty" of "the charges brought against them."  See ECF No. 66-1 at 3, 7, 15 (Question 4).  The survey failed, however, to identify (much less define) the charges brought against the defendants, as any jury instructions would.  It does not show what crime(s) respondents believed the hypothetical defendants had committed, and whether those offenses (real or imagined) resemble the charges at issue here.

The survey also failed to provide respondents with the option of saying they were "unsure" about guilt, even though such an option is required by professional standards that apply in this area.  See American Society of Trial Consultants, Professional Standards for Venue Surveys at 9, available at https://www.astcweb.org/Resources/Pictures/Venue%2010-08.pdf  ("Respondents must be made aware that they can say they do not know or have no opinion.").  The survey instead gave respondents a binary choice between "guilty or not guilty."  ECF No. 66-1 at 15 (Question

4).  Yet even without being provided the appropriate options, 26% of D.C. respondents voluntarily gave an answer of "Depends" or "Don't know/Refused."  *Id.*  This shows that, even in response to a poorly worded question, more than a quarter of the District's residents realized the need to keep an open mind about guilt.

Understood in context, the Select Litigation poll does not indicate any higher degree of juror bias than in *Haldeman*, where the en banc D.C. Circuit found no presumption of prejudice.  In *Haldeman*, 61% of respondents expressed a view that the defendants were guilty, as opposed to the 71% here.  See *Haldeman*, 559 F.2d at 144, 178 n.2 (MacKinnon, J., concurring in part and dissenting in part).  But the survey in *Haldeman* first asked respondents whether they had formed an opinion about whether the indicted Nixon aides were guilty or innocent, giving options for both "No" (*i.e.*, had not formed an opinion) and "Don't Know/No Opinion."  *Id.* at 178 n.2.  The survey then asked whether respondents thought the defendants were "guilty or innocent in the Watergate affair," giving options for "Not Guilty Until Proven" and "No Opinion/Don't Know."  *Id.*  Only after (a) being prompted to consider whether they could actually form an opinion, and (b) being reminded of the presumption of innocence, did 61% of respondents say "guilty."  *Id.*  Here, by contrast, respondents were not provided a "don't know" option, were not reminded of the presumption of innocence, and were asked only whether they thought the "several hundred people" arrested in connection with January 6 were "guilty."  ECF No. 66-1 at 15 (Questions 3, 4).

When asked about guilt in the context of a criminal trial, however, respondents in the Select Litigation survey were far less likely to give an answer of "guilty."  Question 5 asked them to "[a]ssume [they] were on a jury for a defendant charged with crimes for his or her activities on January 6" and then asked whether they were "more likely to vote that the person is guilty or not guilty."  ECF No. 66-1 at 15.  Again, the question failed to specify any particular crime.  In

response to this question, only 52% of D.C. respondents said "Guilty," and fully 46% volunteered a response of "Depends" or "Don't know/Refused." *Id.*  Thus, when asked to consider guilt or innocence in the context of a "defendant charged with crimes," as opposed to the "several hundred people . . . arrested," nearly half of D.C. residents were committed to keeping an open mind—even without being instructed on the presumption of innocence or being provided an option for "Do not know."  This indicates, if anything, a lower degree of prejudice than was present in *Haldeman*.

Fischer also cites a paragraph of Select Litigation's analysis claiming that, of respondents who believe that January 6 defendants will receive a fair trial, 76% have decided that defendants are guilty.  ECF No. 66 at 4 (citing ECF No. 66-1 ¶ 12).  This paragraph of Selection Litigation's analysis fails to provide any citation to support its claims.  In any event, the figures provided are only five percentage points higher than the "guilty" responses to Questions 4 and 5, which is roughly equivalent to the poll's 4.9% margin of error.

Fischer also takes issue with the fact that two-thirds of D.C. respondents (67%) reported that they believed they would get a fair trial in D.C. if they were accused of committing a crime on January 6.  ECF No. 66 at 4 (citing ECF No. 66-1 ¶ 8) (citing ECF No. 66-1 at 15 (Question 6), claiming that "close to four out of ten" thus believed they could not.  His brief does not mention the response to the question that followed: "Do you think the defendants currently charged with crimes for their activities on January 6th will or will not get a fair trial in the District of Columbia?"  ECF No. 66-1 at 15 (Question 7).  An overwhelming 80% of D.C. respondents answered, "yes."[5]  Even the lower percentage (67%) still demonstrates confidence in the justice system in this district.

---

[5] First, Select Litigation asked respondents were asked if they thought they would receive a fair trial if they were defendants (67% said yes); *next*, Select Litigation asked respondents they were asked if they thought the defendants would receive a fair trial.  ECF No. 66-1 at 15 (Q6, Q7).  The second question – to which 80% responded that defendants would be tried fairly – thus reflects the more considered responses.

More fundamentally, though, these responses are of limited relevance. The perceptions of respondents about the availability of a fair trial (without being provided any information about the safeguards to ensure a fair trial and without any explanation for their beliefs) is, at best, an oblique method of probing actual juror bias.

Fischer points out (ECF No. 66 at 1, 6) that, according to the Select Litigation poll, 84% of D.C. respondents had an "unfavorable" view of "people arrested for participating in the events at the U.S. Capitol on January 6."  ECF No. 66-1 at 15 (Question 2).  Although that is higher than the 54% of Atlantans with unfavorable views, it is quite similar to the results of a nationwide CBS poll, which found that 83% of respondents "[s]omewhat disapprove" or "[s]trongly disapprove" of the "actions taken by the people who forced their way into the U.S. Capitol on January 6."  See CBS News Poll, December 27-30, 2021, Question 2, https://drive.google.com/file/d/1QNzK7xBJeWzKlTrHVobLgyFtId9Cgsq_/view.  The defendant has not asked to be tried in Atlanta and has not provided any information about the views in his home district (the Middle District of Pennsylvania), where he requested to be tried in his original motion (but not his supplement).  And, in any event, the fact that many D.C. residents have a generally "unfavorable" view of people "arrested" on January 6 does not mean that an impartial jury cannot be selected in this jurisdiction.  Indeed, one would expect that many people have an "unfavorable" view of people "arrested" for many types of crimes (for example, child exploitation offenses), yet courts are able to select impartial juries and conduct trials for these crimes.

The defendant also points out (ECF No. 66 at 1, 3, 6) that 62% of D.C. respondents (compared to 48% of Atlanta respondents) would describe "most of the people who were arrested for their involvement in the events on January 6th" as "criminals."  ECF No. 66-1 at 15 (Question 10).  The answers to this question, like the "unfavorable" impression of those arrested for their

conduct on January 6), likely reflect the commonly held view that most people arrested for crimes are in fact guilty of those crimes.  But the fact that 62% of D.C. respondents expressed this off-the-cuff view about "most" of the 700-plus January 6th arrestees does not demonstrate that all of those respondents would be unable to impartially find the facts in a specific case after being properly instructed by the Court.  Moreover, the question demonstrates that fully 28% of D.C. respondents would not describe those arrestees as criminals, and 9% were unsure or refused to answer.  ECF No. 66-1 at 15.  And the 14% difference between D.C. and Atlanta—which could easily be explained by demographic differences such as age and education levels, not pretrial publicity (see ECF No. 66-1 at 6, 15)—would not justify the conclusion that this is an "extreme case" in which a change of venue is required.  *Skilling*, 561 U.S. at 381.

Nor should prejudice be presumed because a substantial numbers of respondents "would" describe "the people who forced their way into the U.S. Capitol" as "[t]rying to overturn the election and keep Donald Trump in power" (85%).  ECF No. 66-1 at 16 (Question 11).  For one thing, this question asked specifically about those who "forced their way into the U.S. Capitol," which suggests a higher degree of culpability than simply entering the Capitol.  For another, the poll did not provide an "undecided" option but asked only whether respondents "would" or "would not" use those descriptions.  *Id.*[6]

And, most importantly, the poll did not answer the key question: whether a sufficient number of prospective jurors can "lay aside [their] impression[s] or opinion[s] and render a verdict based on the evidence presented in court."  *Irvin*, 366 U.S. at 723; *see Patton v. Yount*, 467 U.S.

---

[6] This same question also asked respondents whether they would describe the actions of these individuals as "insurrection" or "trying to overthrow the U.S. government," offenses with which no defendant has been charged in connection with January 6, without defining these offenses. *See* 18 U.S.C. §§ 2383, 2385.

1025, 1029 (1984) (no presumption of prejudice where nearly 99% of prospective jurors had heard of the case and 77% indicated on voir dire that "they would carry an opinion into the jury box"). In short, the Select Litigation poll does not come close to demonstrating that "12 impartial individuals could not be empaneled" in Washington, D.C. *Skilling*, 561 U.S. at 382.

In any U.S. jurisdiction, most prospective jurors will have heard about the events of January 6, and many will have various disqualifying biases. But the appropriate way to identify and address those biases is through a careful voir dire, rather than a change of venue based solely on pretrial polling and media analyses. *Webster,* 21-cr-208, ECF No. 78 at 2 (citing *Haldeman,* 559 F.2d at 63). As in *Haldeman*, there is "no reason for concluding that the population of Washington, D. C. [i]s so aroused against [the defendant] and so unlikely to be able objectively to judge [his] guilt or innocence on the basis of the evidence presented at trial" that a change of venue is required. *Haldeman*, 559 F.2d at 62.

## V.    The Select Litigation Media Analysis Does Not Support a Presumption of Prejudice.

Fischer also incorrectly contends that the media analysis conducted by Select Litigation supports a presumption of prejudice. ECF No. 66 at 11-12. The analysis shows that, in nine of the 13 months analyzed, the *Washington Post* ran more news stories about January 6 than did the *Atlanta Journal-Constitution*. ECF No. 66-1 at 10. Again, as with the Selection Litigation poll, this analysis does not focus on Fischer's preferred venue, the Middle District of Pennsylvania, and therefore provides little insight into the media exposure of prospective jurors in that district.

Moreover, for several reasons, these numbers do not demonstrate that media exposure was significantly different in Atlanta than in Washington, D.C. First, the comparison fails to account for the comparative sizes and circulations of the two newspapers. It should not be surprising that a large national newspaper would print more articles on the same topic than a regional newspaper.

Second, the analysis does not account for the fact that many Americans receive their news from national sources such as CNN or Fox News, often filtered through social media.  Thus, prospective jurors in both Washington, D.C. and Atlanta are not limited to their local newspapers and television broadcast stations and may well have been exposed to much of the same media coverage.  Third, simply counting the number of news articles in a given source is not a good way to measure prospective jurors' media exposure.  Indeed, the Select Litigation poll shows comparatively small variations in media exposure between Washington, D.C. and Atlanta.  According to that poll, 99% of D.C. respondents were aware of the January 6 demonstrations, compared to 93% in Atlanta, and 33% of D.C. respondents had seen "A lot" of coverage, compared to 30% in Atlanta.  *Id.* at 14-15. Like the Watergate scandal at issue in *Haldeman*, the storming of the Capitol on January 6, 2021, was "not a local crime of peculiar interest to the residents of the District of Columbia" but one that generated national interest.  *Haldeman*, 559 F.2d at 64 n.43.

The Select Litigation analysis also concludes that "the number of hits from internet sites based in the District of Columbia area was four times higher than the comparable number of hits from sites based in the Atlanta area." ECF No. 66-1 at 10.  But the analysis includes no information about where these hits came from.  Many of the hits on D.C.-based news sources likely came from readers outside the District itself, such as readers in the Northern Virginia and Maryland suburbs or readers from other parts of the country who were directed to D.C.-based news reporting on social media.  A reader in California, for example, would be far more likely to read about January 6 in the *Washington Post* than in the *Atlanta Journal-Constitution*.   Without additional information, this analysis of Internet hits is essentially meaningless.

The Select Litigation analysis is also unhelpful because it considered only the coverage of January 6 in general, as opposed to the coverage of Joseph Fischer.  Fischer is one of more than

770 defendants charged in connection with January 6, and only a fraction of the media coverage has focused on him.  Indeed, the coverage of Fischer is less significant than in *Skilling*, where the Houston Chronicle "mentioned Enron in more than 4,000 articles during the 3-year period following the company's December 2001 bankruptcy" with "[h]undreds of these articles discussing Skilling by name."  *Skilling*, 561 U.S. at 428 (Sotomayor, J., concurring in part and dissenting in part).

Finally, the media analysis fails to support a presumption of prejudice because mere exposure to pretrial publicity does not disqualify a potential juror.  "Prominence does not necessarily produce prejudice, and juror impartiality . . . does not require ignorance." *Skilling*, 561 U.S. at 381.  The Supreme Court has found no presumption of prejudice even when 98% of prospective jurors had heard of the case and 77% indicated on voir dire that "they would carry an opinion into the jury box." *Patton*, 467 U.S. at 1029.   The mere fact that Washington, D.C. news outlets have run more stories about January 6 (and received more hits) than have Atlanta outlets does not suggest that an impartial jury cannot be selected in Washington D.C.

## VI.   The Pretrial Publicity Related to January 6 Does Not Support a Presumption of Prejudice in This District.

In his original motion, and again in his supplement, the defendant contends that prejudice should be presumed based on pretrial publicity.  ECF Nos. 55 at 6-10, 66 at 8-10, 13.  "The mere existence of intense pretrial publicity is not enough to make a trial unfair, nor is the fact that potential jurors have been exposed to this publicity." *United States v. Childress*, 58 F.3d 693, 706 (D.C. Cir. 1995); *see Murphy v. Florida*, 421 U.S. 794, 799 (1975) (juror exposure to "news accounts of the crime with which [a defendant] is charged" does not "alone presumptively deprive[] the defendant of due process").  Indeed, "every case of public interest is almost, as a matter of necessity, brought to the attention of all the intelligent people in the vicinity, and scarcely

any one can be found among those best fitted for jurors who has not read or heard of it, and who has not some impression or some opinion in respect to its merits." *Reynolds v. United States*, 98 U.S. 145, 155-56 (1878). Thus, the "mere existence of any preconceived notion as to the guilt or innocence of an accused, without more," is insufficient to establish prejudice. *Irvin*, 366 U.S. at 723. "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.*

The Supreme Court has recognized only a narrow category of cases in which prejudice is presumed to exist without regard to prospective jurors' answers during voir dire. See *Rideau v. Louisiana*, 373 U.S. 723 (1963). In *Rideau*, the defendant's confession—obtained while he was in jail and without an attorney present—was broadcast three times shortly before trial on a local television station to audiences ranging from 24,000 to 53,000 individuals in a parish of approximately 150,000 people. *Id.* at 724 (majority opinion), 728-29 (Clark, J., dissenting). The Court concluded that, "to the tens of thousands of people who saw and heard it," the televised confession "in a very real sense was Rideau's trial—at which he pleaded guilty to murder." *Rideau*, 373 U.S. at 726. Thus, the Court "d[id] not hesitate to hold, without pausing to examine a particularized transcript of the voir dire," that these "kangaroo court proceedings" violated due process. *Id.* at 726-27.

Since *Rideau*, the Supreme Court has emphasized that a "presumption of prejudice . . . attends only the extreme case," *Skilling*, 561 U.S. at 381, and the Court has repeatedly "held in other cases that trials have been fair in spite of widespread publicity," *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976). In the half century since *Rideau*, the Supreme Court has never presumed prejudice based on pretrial publicity. *But see Estes v. Texas*, 381 U.S. 532 (1965) (presuming prejudice based on media interference with courtroom proceedings); *Sheppard v.*

*Maxwell*, 384 U.S. 333 (1966) (same).  In fact, courts have declined to transfer venue in some of the most high-profile prosecutions in recent American history.  *See In re Tsarnaev*, 780 F.3d 14, 15 (1st Cir. 2015) (per curiam) (capital prosecution of Boston Marathon bomber); *Skilling*, 561 U.S. at 399 (fraud trial of CEO of Enron Corporation); *Yousef*, 327 F.3d at 155 (trial of participant in 1993 World Trade Center bombing); *Moussaoui*, 43 F. App'x at 613 (terrorism prosecution for conspirator in September 11, 2001 attacks); *Haldeman*, 559 F.2d at 70 (Watergate prosecution of former Attorney General John Mitchell and other Nixon aides).

In *Skilling*, the Supreme Court considered several factors in determining that prejudice should not be presumed where former Enron executive Jeffrey Skilling was tried in Houston, where Enron was based.  *Skilling*, 561 U.S. at 382-83.  First, the Court considered the "size and characteristics of the community."  *Id.* at 382.  Unlike *Rideau*, where the murder "was committed in a parish of only 150,000 residents," Houston was home to more than 4.5 million people eligible for jury service.  *Id.* at 382.  Second, "although news stories about *Skilling* were not kind, they contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight."  *Id.*  Third, "over four years elapsed between Enron's bankruptcy and Skilling's trial," and "the decibel level of media attention diminished somewhat in the years following Enron's collapse."  *Id.* at 383.  "Finally, and of prime significance, Skilling's jury acquitted him of nine insider-trading counts," which undermined any "supposition of juror bias."  *Id.*  Although these *Skilling* factors are not exhaustive, courts have found them useful when considering claims of presumptive prejudice based on pretrial publicity.  *See, e.g.*, *In re Tsarnaev*, 780 F.3d at 21-22; *United States v. Petters*, 663 F.3d 375, 385 (8th Cir. 2011).  And contrary to Fischer's contention, ECF No. 55 at 4-10, those factors do not support a presumption of prejudice in this case.

### A.     Size and characteristics of the community

Fischer suggests, ECF No. 55 at 4-5 that an impartial jury cannot be found in Washington, D.C., despite the District's population of approximately 700,000.  Although this District may be smaller than most other federal judicial districts, it has a larger population than two states (Wyoming and Vermont), and more than four times as many people as the parish in *Rideau*.  The relevant question is not whether the District of Columbia is as populous as the Southern District of Texas in *Skilling*, but whether it is large enough that an impartial jury can be found.  In *Mu'Min v. Virginia*, 500 U.S. 415, 429 (1991), the Court cited a county population of 182,537 as supporting the view than an impartial jury could be selected.  And *Skilling* approvingly cited a state case in which there was "a reduced likelihood of prejudice" because the "venire was drawn from a pool of over 600,000 individuals." *Skilling*, 561 U.S. at 382 (quoting *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1044 (1991)).  There is simply no reason to believe that, out of an eligible jury pool of nearly half a million, "12 impartial individuals could not be empaneled." *Id.*

### B.     Nature of the pretrial publicity

Nor does this case involve a "confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight." *Skilling*, 561 U.S. at 382.  Even news stories that are "not kind," *Skilling*, 561 U.S. at 382, or are "hostile in tone and accusatory in content," *Haldeman*, 559 F.2d at 61, do not alone raise a presumption of prejudice.  As in *Skilling* and *Haldeman*, the news coverage of Fischer is "neither as inherently prejudicial nor as unforgettable as the spectacle of *Rideau*'s dramatically staged and broadcast confession." *Id.*  Indeed, although any media characterizations of Fischer would be inadmissible, many of the details reported are drawn from the criminal complaint in this case, such photographs of Fischer on January 6 or statements Fischer made on Facebook regarding his actions on January 6, materials

that would be both admissible and highly relevant at trial.  *Compare Sheppard*, 384 U.S. at 360 (noting that information reported by the media was "clearly inadmissible" and that "[t]he exclusion of such evidence in court is rendered meaningless when news media make it available to the public"), with *Murray v. Schriro*, 882 F.3d 778, 805 (9th Cir. 2018) ("There was no inflammatory barrage of information that would be inadmissible at trial.  Rather, the news reports focused on relaying mainly evidence presented at trial."); *Henderson v. Dugger*, 925 F.2d 1309, 1314 (11th Cir. 1991) ("[B]ecause we have found [the defendant's] confessions were admissible, the damage if any from the [pretrial] publicity is negligible.").

Fischer argues that prejudice should be presumed based on statements by the President, Attorney General of the United States, Speaker of the House, a member of Congress from Missouri made in the days and weeks that followed January 6.  ECF No. 55 at 6-8 (citing, for example, Attorney General Garland's statement that January 6 was a "a heinous attack that sought to disrupt a cornerstone of our democracy" and others' references to January 6 as an "insurrection").[7]  While none of the statements mention Fischer by name, harsh condemnation of a defendant's actions is not uncommon in high-profile criminal cases, and it does not suffice to establish prejudice in any

---

[7] Fischer's characterizations of some of the statements are inaccurate.  Fischer claims that Attorney General Garland "described the individuals involved as 'white supremacists . . . who stormed the Capitol.'"  ECF No. 55, at 7 (citing Hearing before the U.S. Senate Committee on the Judiciary, Merrick Brian Garland (Nominee for Attorney General), February 22, 2021 (2021), https://judiciary.senate.gov/imo/media/doc/SJC%20Testimony.final.pdf (last visited Jan. 11, 2022)).  What Attorney General Garland actually said is: "If confirmed, I will supervise the prosecution of white supremacists and others who stormed the Capitol on January 6."  He did not say that everyone who stormed the Capitol was a white supremacist.  Similarly, when President Biden referred to "group of thugs, insurrectionists, political extremists, and white supremacists," he was not describing "Trump supporters involved in the January 6th incident," as defendant claims, ECF No. 55 at 6, at but those who "violently attack[ed] the Capitol of our democracy."  Remarks by President Biden at Signing of an Executive Order on Racial Equity, The White House (2021), https://www.whitehouse.gov/briefing-room/speechesremarks/ 2021/01/26/remarks-by-president-biden-at-signing-of-an-executive-order-on-racialequity (last visited April 9, 2022).

event.  In *Skilling*, the news stories about the defendant's involvement in Enron's collapse "were not kind," but they "contained no confession or other blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight."  *Skilling*, 561 U.S. at 382. And in *Haldeman*, although some of the coverage of the Watergate scandal was "hostile in tone and accusatory in content," the bulk of the coverage "consist[ed] of straightforward, unemotional factual accounts of events and of the progress of official and unofficial investigations."  *Haldeman*, 559 F.2d at 61.  The D.C. Circuit concluded that the coverage "was neither as inherently prejudicial nor as unforgettable as the spectacle of *Rideau*'s dramatically staged and broadcast confession." *Id.*  The same is true here, where news coverage has not reported on any confession or other blatantly prejudicial information about Fischer – when they have reported on Fischer at all.  And, again, statements by the President, Attorney General, or Speaker of the House are ordinarily reported across the entire country, and exposure to these statements is hardly unique to Washington, D.C.

Fischer also asserts that a fair trial cannot be had in D.C. because of the volume of news coverage of January 6.  But even "massive" news coverage of a crime does not require prejudice to be presumed.  *Haldeman*, 559 F.2d at 61.  A comparatively small percentage of the news coverage of January 6 has focused on Fischer.  Unlike most cases involving pretrial publicity, where the news coverage focuses on the responsibility of a single defendant (as in *Rideau* or *Tsarnaev*) or small number of co-defendants (as in *Skilling* and *Haldeman*), the events of January 6 involved thousands of participants and have so far resulted in charges against more than 775 people.  The Court can guard against any spillover prejudice from the broader coverage of January 6 by conducting a careful voir dire and properly instructing the jury about the need to determine a defendant's individual guilt.

Moreover, while some January 6 defendants claim to have been "singled out" by the D.C. media, *see* Def.'s Mot. to Transfer Venue, *United States v. Riley Williams*, No. 21-cr-618 (ABJ), ECF No 38, at 10, Fischer has made no such claim.  It is unlikely that any significant segment of the D.C. population knows Fischer by name, much less the crimes he is accused of committing. See *United States v. Edmond*, 52 F.3d 1080, 1097 (D.C. Cir. 1995) ("As we have discussed, less than a third of all prospective jurors ever had heard of any of the defendants from the media, much less formed an opinion about their guilt.").  As Judge Mehta found in *Webster*, "there is no reason to believe that members of the jury venire will even know who [Defendant] is or what he allegedly did on January 6, much less that a significant number of the members of the venire will lack the capacity to evaluate the case against Defendant based solely on the facts of his case."  *Webster,* No. 21-cr-208, ECF No. 78 at 2 (quoting *Bochene,* 2022 WL 123893, at *2).  The defendant in *Webster* was a member of the New York Police Department and Marine Corps veteran who is accused of assaulting police with a metal pole; surely Fischer is of equal or less notoriety. Statement of Facts, *Webster,* 21-cr-208, ECF No. 1-1 at 2.  And again, even if the jurors did know of Fischer, "[p]rominence does not necessarily produce prejudice, and juror impartiality . . . does not require ignorance." *Skilling*, 561 U.S. at 381.  Here, there is no "reason to believe that the *voir dire* process will prove ineffective in identifying any members of the venire who lack the requisite impartiality to serve on a jury." *Webster,* 21-cr-208, ECF No. 78 at 2 (quoting *Bochene,* 2022 WL 123893, at *2).

And, in any event, any threat of such spillover prejudice is not limited to Washington, D.C. because much of the news coverage of January 6 has been national in scope.  See *Haldeman*, 559 F.2d at 64 n.43 (observing that "a change of venue would have been of only doubtful value" where much of the news coverage was "national in [its] reach" and the crime was of national interest).

The *Washington Post*, which defendant characterizes as a "DC paper" (ECF No. 66 at 10) is more of a national newspaper than a local one, especially as far as its coverage of national politics is concerned.[8]  As the Select Litigation poll demonstrates, the number of potential jurors exposed to "[a] lot" of news coverage of January 6 differs only slightly between Washington, D.C. (33%) and Atlanta (30%).  ECF No. 66-1, at 15 (Question 8).  There is an even smaller difference (2%) between the number of individuals in Washington D.C. and Atlanta reporting that the media coverage they have seen, heard, or read suggests that the defendants are guilty.  ECF No. 66-1 at 15 (Question 9).  Perhaps the clearest example is Fischer's claim that lawmakers made statements on social media—the reach of which is indisputably worldwide.  ECF No. 55 at 7.

Indeed, the local news coverage that exists concerning Fischer appears to be greater in his home district—the alternative venue his original motion requests.  Of the top ten results in a recent Google search for "Joseph W. Fischer," three results were from news sources in the Middle District of Pennsylvania (*Penn Live-Patriot News* (a Harrisburg publication), Harrisburg affiliate ABC27, and the *Lebanon Daily News*), a fourth was from the *Philadelphia Inquirer*, one was from the *Washington Post*, and the remaining results were from the Department of Justice website, the *Daily Beast*, the *Conan Daily* (a self-described "global publication"), the United Kingdom's *Daily Mail*, and the court docket website Court Listener.  The news articles returned by this search were over a year old.  In general, moreover, it "consists of straightforward, unemotional factual accounts of events and of the progress of official and unofficial investigations."  *Haldeman*, 559 F.2d at 61.  Thus, the nature and extent of the pretrial publicity do not support a presumption of prejudice.

---

[8] For example, in January 2021, Washingtonpost.com had more than 111 million unique visitors, even more than the *New York Times, USA Today*, or *The Wall Street Journal Online.*  "More than 111 million people visited The Washington Post in January 2021," *available at https://www.washingtonpost.com/pr/2021/02/18/more-than-111-million-people-visited-washington-post-january-2021/* (last visited April 9, 2022).

### C.       Passage of time before trial

In *Skilling*, the Court considered the fact that "over four years elapsed between Enron's bankruptcy and *Skilling*'s trial."  *Skilling*, 561 U.S. at 383.  In this case, 15 months have already elapsed since the events of January 6.  Still more time will elapse before trial.  This is far more than in *Rideau*, where the defendant's trial came two months after his televised confession. *Rideau*, 373 U.S. at 724.  Although January 6 continues to be in the news, the "decibel level of media attention [has] diminished somewhat," *Skilling*, 561 U.S. at 383.  Moreover, a negligible percentage of the recent stories have mentioned Fischer, and much of the reporting has been national is scope, rather than limited to Washington, D.C.  While still not extensive, the most prominent news coverage of Fischer occurred upon Fischer's arrest in February, 2021 – which is now more than a year in the past as well.  To the extent that there has been news coverage of this case in the last year, as far as the government is aware, it has discussed Fischer's successful motions to modify his pretrial release conditions and to dismiss the obstruction charge against him, coverage which is, if anything, favorable.  *See, e.g.*, "Federal Judge Dismisses Felony Obstruction Charge  in  Second  Jan. 6  Case  in  8  Days,"  *The Epoch Times*,  available  at https://www.theepochtimes.com/mkt_app/federal-judge-dismisses-felony-obstruction-charge-in-second-jan-6-case-in-eight-days_4342648.html (last visited April 9, 2022).  The statements made by national public officials condemning various aspects of the January 6 attack that Fischer cites (ECF No. 55 at 6-8) are now all more than a year in the past as well.

### D.       The jury verdict

Because Fischer has not yet gone to trial, the final *Skilling* factor—whether the "jury's verdict . . . undermine[s] in any way the supposition of juror bias," *Skilling*, 561 U.S. at 383—does not directly apply.  But the fact that *Skilling* considered this factor to be "of prime significance,"

*Id.*, underscores how unusual it is to presume prejudice before trial.  Ordinarily, a case should proceed to trial in the district where the crime was committed, and courts can examine after trial whether the record supports a finding of actual or presumed prejudice.

In short, none of the *Skilling* factors support the defendant's contention that the Court should presume prejudice and order a transfer of venue without even conducting voir dire.

## VII.    Recent Trials in this District Do Not Support Defendant's Request to Transfer

Citing the recent trial in *United States v. Reffitt*, No. 21-cr-32 (DLF), defendant argues that the other January 6, 2021 trials in this district will (1) diminish the jury pool and (2) create more negative publicity, generating prejudice.   ECF No. 66 at 14-15.   Since Fischer filed his supplemental motion, two more January 6 defendants have been convicted after jury trials in *United States v. Robertson*, No. 1:21-cr-34 (CRC), and *United States v. Thompson*, No. 1:21-cr-161 (RBW), and two others have gone to bench trials, resulting in an acquittal, *United States v. Martin*, No. 21-cr-394, and a mixed verdict, *United States v. Griffin,* No. 21-cr-92.  Although each of these cases generated media coverage, that coverage was not confined to the District of Columbia and was focused on the defendants in those cases, without mentioning Fischer.  *See, e.g.*, Judge Finds Man Not Guilty in First Jan. 6 Acquittal, *New York Times*, https://www.nytimes.com/2022/04/06/us/politics/matthew-martin-capitol-acquittal.html     (last visited April 9, 2022).[9]

Additionally, Fischer's case is not set for trial yet.  Therefore, even more time will have passed since the siege at the Capitol on January 6, 2021, and since these initial January 6 trials. And as more January 6 defendants go to trial, the level of media attention given to each particular

---

[9] To the extent the trials have resulted in acquittals, as in *Martin,* coverage those verdicts could influence prospective jurors to view January 6 defendants more favorably.

trial is likely to diminish.  In summary, Fischer cannot show that jurors in this District, carefully selected after a thorough *voir dire* and properly instructed in the law, would be more likely to convict him simply because they were exposed to media coverage of other January 6 trials.

*Reffitt*, *Thompson,* and *Robertson* also demonstrate that the Court can, through voir dire, successfully seat a panel of jurors in this district.  Fischer, however, warns (ECF No. 66 at 15) that "already-small pool of even potentially eligible jurors will shrink" as cases proceed to trial before his.  But each trial will barely touch the potential jury pool.  Assuming (1) a jury pool of 500,000 out of nearly 700,000 residents, and (2) approximately 80 people being summoned per trial, (2) that no one even summoned for jury service in a January 6 case could be summoned again (even if not individually questioned or actually seated on a jury), over 60 trials would have to occur before even *one percent* of the jury pool had been called.  Accordingly, by the time Williams's case proceeds to trial, there will still be a substantial number of potential jurors, who have never been summoned to a January 6 trial, still available for *voir dire.*

## VIII.  Fischer Fails to Show that the Middle District of Pennsylvania is a Suitable Alternative Venue

As noted above, Fischer's original motion, but not his supplement, requests that the case be transferred to the Middle District of Pennsylvania.  Assuming that Fischer maintains this position, he has failed to support it.  Fischer makes no showing as to the prevalence of potential bias in Harrisburg and does not establish Harrisburg as a suitable alternative forum.  The Select Litigation poll on which he relies compares Washington D.C. with Atlanta, and he does not show that Atlanta and Harrisburg, cities in different parts of the country, are comparable.  Moreover, as noted above, publicity regarding Fischer appears to be more extensive in the Middle District of Pennsylvania than in Washington, D.C., so juror bias may be an even greater issue there (compounded by the fact that Fischer worked in local law enforcement and may be known to

residents in the area).  Moreover, when selecting a transferee district, "[s]everal courts have suggested that a venue change is usually more effective if it is to a more, rather than less, metropolitan community because a big case in a small town quickly becomes a cause celebre and the focus for substantially more publicity than existed at the time the decision to transfer was made." *Chapin*, 515 F.2d at 1288.  Harrisburg is not a more metropolitan community than Washington, D.C.  Fischer does not establish that "a large jury pool is available" there.  See *McVeigh*, 918 F. Supp. at 1474 (transferring case to Denver because it was a "large metropolitan community with many community resources," was "readily accessible, being well served by daily non-stop flights from all relevant cities," and had a "large jury pool," and court facilities that can accommodate the special needs of the trial, among other factors).[10]

Fischer also argues that Harrisburg would be "not overly inconvenient" for the government or witnesses.  ECF No. 55 at 11. The majority of government witnesses are likely to be Capitol Police or Metropolitan Police Department officers, including the victim officers, who are based in Washington, D.C.; traveling to Harrisburg requires a 4-5 hour train trip with a connection (and therefore likely an overnight stay) or private transportation.

Fischer claims that unspecified "defense witnesses" are located in Harrisburg.  ECF No. 55, at 11.  Judge Lamberth recently rejected this argument, finding "generally, a naked allegation that witnesses will be inconvenienced by trial in a distant forum will not suffice for transfer….Transfer motions must identify the inconvenienced witness whom defendant proposes to call and contain a "showing" of the proposed witnesses' testimony." *Brooks*, No. 21-cr-503 (RCL), ECF No. 31 at 3 (citation omitted).  Fischer's motion does not so do.

---

[10] Here, the special needs may include the need for a large courtroom to conduct *voir dire* while respecting COVID-19 protocols.

### IX.   A Jury Questionnaire Is Not Necessary in This Case

Fischer's motion also argues that, wherever he is tried, the court "must utilize a comprehensive juror questionnaire."  ECF No. 55 at 11.  He is incorrect.  Although this Court has discretion to use a written questionnaire, it need not do so because it can select an impartial jury using only in-person voir dire.[11]  Issues of pre-trial publicity and potential prejudice are more meaningfully explored by in-person examination than by use of a jury questionnaire. "[W]ritten answers [do] not give counsel or the court any exposure to the demeanor of the juror in answering the . . . questions."  *Mu'Min*, 500 U.S. at 425.  A prospective juror's tone of voice and demeanor are important.  *See Rosales-Lopez*, 451 U.S. at 188 (observing that the court "must reach conclusions" based on its "own evaluation[] of demeanor evidence and of response to questions").  Indeed, "[h]ow a person says something can be as telling as what a person says." *United States v. Jackson*, 863 F. Supp. 1449, 1459 (D. Kan. 1994); *see also Mu'Min*, 500 U.S. at 433 (O'Connor, J., concurring) ("A particular juror's tone of voice or demeanor might have suggested to the trial judge that the juror had formed an opinion about the case and should therefore be excused.").  And even where a questionnaire is used, in-person follow-up questioning is important to give the court the "face-to-face opportunity to gauge demeanor and credibility."  *Skilling*, 561 U.S. at 395.  A jury questionnaire would not materially assist jury selection in this case, since there is no suggestion that this particular defendant has received significant, unfavorable pretrial publicity, and any potential prejudice due to general media

---

[11] Some judges in this District have used written questionnaires to aid in screening potential jurors in particular cases. *See, e.g., United States v. Stone*, --- F. Supp. 3d ---, 2016 WL 1892360, at *2-3 (D.D.C. Apr. 16, 2020); *United States v. Lorenzana-Cordon*, No. 03-cr-331, 2016 WL 11664054, at *1 (D.D.C. Feb. 22, 2016).  But the practice is not common in this District.

coverage of the events of January 6, 2021 can be adequately probed through in-person voir dire examination.

## **CONCLUSION**

For the foregoing reasons, the defendant's motion to transfer venue should be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     _/s/ Alexis J. Loeb_____
Alexis J. Loeb
Assistant United States Attorney
Detailee
C.A. Bar No. 269895
450 Golden Gate Ave., 11th Floor
San Francisco, CA 94102
(415) 436-7168
Alexis.Loeb@usdoj.gov