**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **Case No. 21-CR-234-CJN** |
| | **:** | |
| **JOSEPH W. FISCHER,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO MODIFY CONDITIONS OF RELEASE

The United States of America by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in opposition to defendant Joseph Fischer's Motion to Modify Conditions of Release ("Mot."), ECF No. 89. Fischer, indicted for assaulting, resisting, or impeding officers on January 6, was released on conditions, including that he not possess a firearm.  He now seeks permission to keep firearms in his home to protect chickens against "most likely a raccoon." *Id.* at 3. Because the release condition continues to serve the purpose of protecting the public, because the showing of a need to relax the firearms condition is inadequate, and because the Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), does not require a different result, the Court should deny the motion.

Fischer's conduct before, during, and after January 6 raises concerns that he poses a danger to the community. Fischer attacked officers on January 6, was enflamed and defiant during his arrest, and has engaged in threatening behavior since then, including in a government hearing where he had to be physically restrained. The government originally sought Fischer's detention. At a minimum, the firearms restriction must remain in place for the safety of the community.

Moreover, Fischer has not shown that he needs a gun. He claims to seek merely to protect

1

his chickens from raccoons (or other predators). But there are several ways of doing so that do not involve arming Fischer, ways that would seem more effective than the defendant lurking overnight with a gun, hoping to catch a nocturnal animal. And unlike Fischer's last request to possess firearms, which was limited to a short trip where he would be in the presence of a larger group, this request would allow him unfettered access to firearms for an indefinite period.

Fischer also argues that the Supreme Court's decision in *Bruen*, 142 S. Ct. 2111, supports his claim, but it does not, as other courts in this district affirming firearms restrictions pretrial have found. Order, *United States v. Garcia,* 21-cr-129 (ABJ), ECF No. 84 (D.D.C. July 26, 2022). Order, *United States v. Kastner*, 21-cr-725 (MAU), ECF No. 97 (D.D.C. Mar. 16, 2023), *aff'd,* ECF No. 120 (D.D.C. June 28, 2023) (Moss, J.)*.* It would be odd indeed for the Court to find that it could jail the defendant pending trial, limiting his most fundamental liberty right, but could not release him with a firearms restriction. Second Amendment freedoms are not so *sui generis* that they alone may not be restricted pending trial. And it could lead to perverse results where, unable to block individuals accused of violent felonies from accessing guns while awaiting trial, the government would be forced seek detention where it otherwise might have agreed to release. No court has found that *Bruen* requires this result, and for good reason: *Bruen* did not disturb the Supreme Court precedent permitting firearms restrictions; Fischer, as a person under indictment for felony offenses, is outside *Bruen*'s protections, and historical analogues support the Court's ability to restrict firearms pending trial.   The Court should deny Fischer's motion.

## **FACTUAL BACKGROUND**

Before January 6, 2021, Fischer contemplated violence. On January 6, he committed an act of violence. And since January 6, 2021, he has displayed threatening behavior on multiple occasions.

## I.      Fischer's Communications Before January 6

Over text message, Fischer, a police officer at the time, discussed plans for January 6 in Washington, D.C., sometimes in violent terms. On December 16, 2020, he sent a text message stating, "Take democratic congress to the gallows," followed by "Can't vote if they can't breathe..lol." He also wrote, "It might get violent.... they should storm the capital and drag all the democrates [sic] into the street and have a mob trial." One message contemplated using firearms for political violence: "If Trump don't get in, we better get to war or we will lose our country. I have a shitload of dyes and stuff from lead reloading years ago, but I haven't reloaded in 20 years. I should take inventory and see what dyes I have. Do you have an AR-15 or something like that?"

## II.     Fischer's Participation in the Capitol Riot

At approximately 3:24 p.m. on January 6, Fischer stood just outside the Rotunda Doors, an entrance to the U.S. Capitol Building that rioters had breached. "Charge!" he yelled. "Charge!" he yelled again, and again. He pushed forward through the crowd to the doorway, holding his phone in the air. Then, on the heels of a rioter wielding a flag, he galloped forward into the Capitol, toward the police line, yelling "Motherfuckers!"   Inside the building, Fischer and the other rioters made contact with police and fell to the ground. After being helped back on his feet, instead of leaving, Fischer pressed up against an officer's riot shield. He had to be pushed out the door.

## III.    Statements After January 6

The next day, Fischer posted the video of his charge into the Capitol on Facebook, accompanied by the following text: "Made it inside ... received pepper balls and pepper sprayed. Police line was 4 deep.. I made it to level two." He also posted that" We pushed police – we pushed police back about 25 feet, got pepper balled and OC sprayed, but entry into the Capitol was needed to send a message that we, the people, hold the real power." Describing a conversation with his

police chief, Fischer posted: "I told him if that is the price I have to pay to voice my freedom and liberties which I was born with and thus taken away, then then (sic) must be the price," "I told him I have no regrets and give zero shits," and "Sometimes doing the right thing no matter how small is more important than one's own security." He posted a photograph to Facebook that appears to show him wearing a ballistic vest on January 6.

On January 21, Fischer sent a message, "Yet the[] want peace ......fuck peace...I want an uprising. Resistance.. too many have fought for this country and too many have died for our liberti[e]s only to have these blind sheep try to take it all away."

## IV.    Arrest, Release on Conditions, and Indictment

Fischer was initially charged by complaint on February 17, 2021, with civil disorder (in violation of 18 U.S.C. § 231(a)(3)), obstruction of an official proceeding (in violation of 18 U.S.C § 1512(c)(2)) and two misdemeanors. ECF No. 1. On the morning of February 19, the chief of the North Cornwall Township police (the police force with whom Fischer worked) and FBI agents went to Fischer's home to take him into custody after he did not answer multiple phone calls from his chief. The police chief knocked on Fischer's door. Fischer did not answer right away, but, when he did come outside, and was immediately confrontational, shouting obscenities. He got within inches of the police chief's face and yelled that he had no regrets about his actions. He continued to yell obscenities at the rest of the arrest team and assumed what one of the arresting agents described as an aggressive posture, with a puffed-up chest and his nose up against an agent's nose, before ultimately complying with orders.

Agents asked Fischer for his cell phone, for which they had a search warrant. Fischer provided a phone, which the FBI later learned had not been in use since well before January 6. The

FBI later found the phone which Fischer had brought with him to the Capitol hidden under a bed. FBI also found six rifles and two pistols in Fischer's house.

As FBI transported Fischer to the jail, he made a statement about nothing mattering after that day. Agents asked him if he planned to harm himself, and he said no, but then said that his children were older, and it didn't matter if he was gone. He also referred to his wife, suggesting that, even if he did harm himself, she would benefit financially.

After Fischer's initial appearance on the charges in the Middle District of Pennsylvania, Magistrate Judge Susan E. Schwab held a combined preliminary and detention hearing there on February 23, 2021. Weighing the § 3142(g) factors, Magistrate Judge Schwab ordered defendant released on strict conditions, including home detention with location monitoring and a prohibition on firearms and access to social media. At defendant's initial appearance in this district on February 25, 2021, Magistrate Judge Meriwether prohibited the possession of all firearms, destructive devices, or weapons.[1] ECF No. 10 at 2 (Condition 7(k), stating "The defendant must (k) not possess a firearm, destructive device, or other weapon").

On March 19, 2021, the grand jury returned a seven-count indictment against defendant, charging him with assaulting, resisting, or impeding officers, in violation of 18 U.S.C. § 111(a) and (2), civil disorder, in violation of 18 U.S.C. § 231(a)(3), obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2), and misdemeanors. The current superseding indictment includes the same charges.

On November 8, 2021, the Court temporarily relaxed the release condition and permitted Fischer to use a muzzleloader or a bow for hunting while on a family hunting trip.

---

[1] At the time, many January 6 defendants were prohibited only from possessing *illegal* firearms.

## V.      Post-Indictment Conduct

While he has been compliant with release conditions, Fischer has nonetheless displayed flashes of anti-government anger and defiance. In November 2021, Fischer and representatives of the North Cornwall Township attended an appellate hearing at the Pennsylvania Department of Labor concerning his employee benefits. The FBI case agent sat in the public viewing area of the hearing. At the beginning of the hearing, the Referee of Appeals asked all parties present to identify themselves, including the agent. When the agent identified himself, Fischer jumped out of his seat and became loud, agitated and belligerent. He approached the agent and, turned to the agent and, pointing his finger at the agent, he shouted statements including, "I haven't forgotten about you." Fischer then objected to the agent being present, accused township officials of using the agent against him, and called the township's witness and counsel names. Fischer finally was physically restrained by his son, who wrapped him in a bear hug and escorted him out of the room. After Fischer left the hearing room, he verbally harassed a witness for the township who was seated in a waiting room outside.

Then, in January 2022, Fischer confronted a North Cornwall Township Supervisor ("Supervisor") at his business. Fischer approached Supervisor when he was alone, with one hand in his coat pocket and one hand out. At the beginning of the interaction, he seemed agitated, and started talking about the Labor Department meeting, how angry he was, and how he had to be restrained by his son. He claimed he had been wronged by the township. The purpose of his visit was unclear. While Fischer had calmed down from his initial agitated state by the end of the encounter, Supervisor was left feeling concerned that about Fischer's presence at future township meetings, and considered increasing security measures. He described Fischer as a "wild card."

Fischer also expressed his ongoing anger at the FBI on social media. In a March 31, 2022, social media post (under a pseudonym), in response to the death of a police officer, Fischer blamed the FBI for arresting him and attempted to doxx the case agent: "Thanks to the fucking FBI I was not able to be there…Fuck agent [name of case agent]."

## VI.    Chicken Coop Protection

Fischer wishes to use firearms to protect chickens he keeps at home, noting that "a few" chickens have recently been killed by "a predatory animal(s) – most likely a raccoon." Mot. at 3. The Pennsylvania Game Commission describes several methods for dealing with "nuisance wildlife," specifically including raccoons. *See https://www.pgc.pa.gov/Wildlife/Pages/NuisanceWildlife.aspx.* "The solutions to these problems include everything from hiring a wildlife pest control agent, using traps and making modifications to your home, to removing certain vegetation, placing fence and hunting. Exclusion and trapping are probably the two most commonly used approaches for dealing with nuisance wildlife." *Id.* Raccoons are nocturnal. "Raccoon," Pennsylvania Game Commission, *available at https://www.pgc.pa.gov/HuntTrap/TrappingandFurbearers/Documents/raccoon.pdf.*

Other websites suggest several methods that do not include hunting, such as reinforcing a fence so that it is at least 6 feet high and 18 inches underground and constructed of strong chain link, collecting eggs regularly, and making sure baby chicks roost before dusk. "Raising happy chickens," *available at* https://www.raising-happy-chickens.com/raccoon-facts.html#:~:text=Raccoons%20will%20rarely%20eat%20a,signs%20of%20a%20raccoon%20presence. "Check your coop daily for places where a raccoon could slip in… Make the chickens a roosting area that is completely secure and out of reach of grabbing raccoon hands… If you have raccoons, you can set up live traps to catch them and relocate them."  News from the Coop,

*available at* https://newsfromthecoop.hoovershatchery.com/identifyingpredatorsracoons/. Another website advises securing coops and enclosures, reinforcing doors and windows, installing electric fencing, removing attractions (such as open trash cans), using motion-activated deterrents, such as motion-activated lights, using mothballs or scents that raccoons do not like; locking chickens into coops at night; or having geese or other guard animals. "Chickens and more," *available at* https://www.chickensandmore.com/do-racoons-eat-chickens/#Protecting_Your_Flock_from_Raccoon_Attacks. Various exterminator and wildlife management companies offer their services to assist.

## **ARGUMENT**

### I.  **Applicable Authority**

Pursuant to 18 U.S.C. § 3142(c), if a judicial officer determines that the release described in 18 U.S.C. § 3142(b) (release on personal recognizance, or with an unsecured appearance bond) will *not* reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community, the judicial officer must order the pretrial release of the person subject to "the least restrictive further condition, or combination of conditions, that such judicial officer determines will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(c)(1)(B). The conditions "may include . . . [any of the thirteen possible conditions listed] or any other condition that is reasonably necessary." *Id.* One of the thirteen conditions listed is: "refrain from possessing a firearm, destructive device, or other dangerous weapon." *Id.* § 3142(c)(1)(B)(viii). Thus, the Bail Reform Act permits a weapons restriction where the court finds that it (in combination with other conditions imposed) is "reasonably necessary to protect the community."

In determining appropriate conditions of release, the judicial officer considers factors including: (1) "the nature and circumstances of the offense charged," (2) "the weight of the evidence," (3) "the history and characteristics" of the defendant, and (4) "the nature and seriousness of the danger to any person or the community that would be posed by the [defendant's] release." 18 U.S.C. § 3142(g)(1)-(4) (the "Section 3142(g) factors"). The judicial officer may amend a release order "at any time." 18 U.S.C. § 3142(c)(3).

The Second Amendment reads: "A well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend. II. In *District of Columbia v. Heller*, the Supreme Court held "that the Second Amendment conferred an individual right to keep and bear arms" and that the District of Columbia's "ban on handgun possession in the home" violated that right. 554 U.S. 570, 625, 635 (2008).   In *Bruen*, the Court made *Heller* "more explicit." 142 S. Ct. at 2131, 2134. It held "that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 2126. In that case, a regulation is valid if the government shows "that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.*

## II.     The Section 3142(g) Factors Support Restricting Defendant's Access to Weapons

Fischer's firearms restriction should stay in place. Restricted access to firearms is reasonably necessary to ensure the safety of the public, which includes the pretrial officers who may conduct supervision. Fischer stands accused of assaulting, resisting, or impeding officers and other offenses. His rhetoric before January 6 invoked violence, including violence involving firearms; on that day, he chose to charge straight into a line of officers, exhorting the crowd around him to do the same. During his arrest, he exhibited defiance and anger toward law enforcement, as well as a degree of nihilism that caused concern that he might be willing to harm himself, or that

he was no longer deterred by the possibility of restrictions on his liberty or even the loss of his own life. While the government's window into his actions after January 6 is limited, the fact that he chose to lash out an at FBI agent and had to be physically restrained by his son indicates a risk that he cannot keep his anger in check. The fact that this outburst happened at a government agency hearing, in front of the referee who was to decide his appeal, in a setting where he had every incentive to keep his behavior in check, is all the more concerning. And it appears that his anger at the FBI agent's presence lingered for months, causing him to confront a local government official in a way that caused that individual to fear for the safety of himself and other officials, and then post an angry message on social media.

Fischer's release conditions are, on balance, not highly restrictive – he is under no curfew or GPS monitoring. The firearms restriction, which has been imposed on most January 6 defendants in this district, is an important part of the least restrictive combination of conditions to ensure the safety of the community, including court officers who may need to visit defendant at his home.  *See, e.g., United States v. Snead*, No. 12-132M, 2014 WL 4473773, at *8 (D.R.I. Feb. 4, 2014), at *8 ("[T]he imposition of a pretrial restriction on the possession of firearms has been found to be critical in most cases because it safeguards the Pretrial Services officers who visit the home in the course of supervision."); *United States v. Smedley*, 611 F. Supp. 2d 971, 974 (E.D. Miss. 2009) (imposing the restriction "is a precaution to safeguard pretrial services officers who will have contact with the defendant in their supervisory activities").

Quite unlike his previous request, which was to go on a short hunting trip with a family group, Fischer now seeks unfettered access to firearms at his home. The supposed desire to defend his chickens does not justify the risk to the safety of the community, the FBI, and the court officers entrusted with protecting us all.

Fischer makes very little showing that a firearm is necessary for him to protect his chickens (which do not appear to be a source of livelihood here). *See* Apr. 27, 2023 Minute Order, *United States v. Mileur*, 21-cr-248 (RDM) (denying motion to remove firearms restriction probation condition where defendant made inadequate showing of need to shoot predators; in that case, moose). The chicken-related websites surveyed above do not promote shooting raccoons to protect chickens. Instead, they suggest other techniques, such as reinforced fencing, ensuring that other items attractive to raccoons are covered, and ensuring that chickens are not outside the coop at night. The Pennsylvania Game Commission notes that trapping and exclusion are two common techniques.

Moreover, Fischer's plan seems impractical. Raccoons are nocturnal animals. Does Fischer plan to lie in wait all night, hoping to run out and catch a raccoon in the act at some point, run outside, grab his firearm, and shoot it? And a gunshot might scare one raccoon away, but what about others? He does not show why other methods, which do not require him to arm himself, would not be effective (while better safeguarding community safety), nor does he explain how shooting the raccoons is necessary here. The potential benefit to the unspecified number of chickens in his coop, where other methods are available, does not outweigh the risk to community safety here.

III.    ***Bruen* Neither Requires Nor Supports Relaxing the Firearms Restriction Here**

Fischer does not go so far as to argue that a pretrial firearms restriction (let alone a restriction for an individual accused of a felony involving violence, such as himself) is unconstitutional. Instead, he argues that the Supreme Court's decision in *Bruen* "supports" his request. Mot. at 4. It does not—as recognized in other January 6 cases, including one involving a pretrial firearms restrictions imposed in a misdemeanor case. Order, *Garcia,* 21-cr-129 (ABJ),

ECF No. 84. Order, *Kastner*, 21-cr-725 (MAU), ECF No. 97, *aff'd,* ECF No. 120 (D.D.C. June 28, 2023) (Moss, J.); *United States v. Slye*, No. 1:22-MJ-144, 2022 WL 9728732, at *2-*3 (W.D. Pa. Oct. 6, 2022)*.* The Ninth Circuit agrees. *United States v. Fencl,* No. 21-CR-3101 JLS, 2022 WL 17486363, at *3 (S.D. Cal. Dec. 7, 2022), *aff'd sub nom., opinion forthcoming, United States v. Garcia*, No. 22-50314, 2023 WL 2596689 (9th Cir. Jan. 26, 2023).

**A. *Bruen* did not end the Court's ability to impose pretrial firearms restrictions.**

*Bruen* casts no doubt on decisions upholding significant restrictions on the liberty interests of those charged with crimes and awaiting trial. To the contrary, the Supreme Court has held that the law allowing a court to detain a defendant before trial based on community safety "fully comports with constitutional requirements." *United States v. Salerno*, 481 U.S. 739, 741 (1987). Under *Salerno,* restrictions on a defendant's liberty while charges are pending, even those as significant as detention, are necessary regulatory measures that do not violate the Constitution. *Id.* at 748.

Upon being charged with a crime, many of an individual's constitutional rights are subject to limitation. He may be searched incident to his arrest, *United States v. Robinson*, 414 U.S. 218, 224-226 (1973); strip searched, *Florence v. Board of Chosen Freeholders*, 566 U.S. 318, 322-323 (2012); detained pending arraignment, *County of Riverside v. McLaughlin*, 500 U.S. 44, 52 (1991); and detained pending trial with his assets frozen, precluded from hiring Sixth Amendment counsel of choice. *Salerno*, 481 U.S. at 739; *Kaley v. United States*, 571 U.S. 320 (2014). Despite the First Amendment freedoms of speech and the press, those detained can be prohibited from receiving books and magazines from private parties. *Bell v. Wolfish*, 441 U.S. 540, 549-552 (1979).

If an indictment for a crime and the interests in community safety can justify restrictions on Fourth, Fifth, and Sixth Amendment rights and even outright detention pending trial, then they

can also justify the restriction of a defendant's Second Amendment rights as a temporary and judicially authorized condition of pretrial release. *See Bruen*, 142 S. Ct. at 2130 ("Th[e] Second Amendment standard accords with how we protect other constitutional rights."); *id.* at 2156 (emphasizing the Second Amendment is subject to the same "body of rules" as "other Bill of Rights guarantees"). If it is constitutional to take away a defendant's "fundamental" liberty interest altogether before trial to ensure community safety, as *Salerno* found that it is, then it must also be constitutional to take the lesser measure of restricting gun rights, but not liberty more broadly, to ensure community safety. *See Slye*, 2022 WL 9728732, at *2-*3 (rejecting *Bruen* challenge to pretrial firearms restriction); *Cf. Kaley*, 571 U.S. at 330 ("it would be odd to conclude" that the government cannot seize forfeitable assets on a grand jury's probable-cause finding when that showing is often sufficient to "restrain *persons*" (citation omitted)); *United States v. Stephens*, 594 F.3d 1033, 1039 (8th Cir. 2010) (Congress's power to ban bail in some cases implies the power to impose "the Adam Walsh Act's much less restrictive mandatory release conditions" requiring a curfew and electronic monitoring).

*Bruen* does not alter that conclusion. It "decide[d] nothing about who may lawfully possess a firearm." *Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring). *Bruen* reaffirmed *Heller*'s observation that, "[l]ike most rights, the right secured by the Second Amendment is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Bruen*, 142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 626). And it clarified that the Second Amendment is equal to other rights, but never suggested that it received extra protections. *See Bruen*, 142 S. Ct. at 2130 ("Th[e] Second Amendment standard accords with how we protect other constitutional rights."). It said nothing about detention, bail, conditions of bail, or the constitutional rights that are necessarily restricted because of detention or bail conditions. In fact,

it did not even cite *Salerno*, let alone purport to limit it. In sum, *Bruen* does not call into question *Salerno*'s conclusion that the Bail Reform Act's pretrial detention provision is constitutional, which by close analogy confirms the validity of the Act's pretrial-release conditions.

*Salerno* is therefore dispositive here. This Court must follow on-point Supreme Court decisions even if *Bruen* could be construed as implicitly raising questions about that restriction. It should apply *Salerno* and leave to the Supreme Court the prerogative of limiting that precedent in the context of guns if it deems it appropriate. *Cf. Agostini v. Felton*, 521 U.S. 203, 237 (1997) ("[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other lines of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions" (citation omitted); *see United States v. Wendt,* No. 422CR00199SHLHCA1, 2023 WL 166461, at *5 (S.D. Iowa Jan. 11, 2023) (rejecting challenge to pretrial firearms restriction under *Bruen*, and noting, "[t]his Court is unwilling, without much clearer guidance from higher courts, to conclude the Supreme Court *sub silentio* intended to overrule *Salerno . . .* (among other cases) when it decided *Bruen*"); *see also* Order, *Garcia,* No. 21-cr-129 (ABJ), ECF No. 84 at 11 (holding that, post-*Bruen*, the court may continue to exercise its discretion to impose a firearms restriction under the Bail Reform Act).

## B.   Fischer is outside the class of persons to whom *Bruen* applies.

Moreover, even were the Court to apply *Bruen,* it would not help Fischer. In *Bruen*, the U.S. Supreme Court repeatedly confirmed that the Second Amendment presumptively guarantees the right of "ordinary, law-abiding," "responsible" citizens to keep and carry firearms. *Bruen*, 142 S. Ct. at 2134; *see also Heller*, 554 U.S. at 635. It used the term "law abiding" 14 times. 142 S. Ct. at 2122, 2125, 2131, 2133-34, 2135 n.8, 2138 & n.9, 2150, 2156.

Fischer falls outside the Second Amendment's protection because he is not an "ordinary, law-abiding" citizen. He is under felony indictment for assault and other crimes, and there has been an individualized finding that he poses enough of a danger that a firearms condition is part of the least restriction combination of conditions needed to protect community safety. Second Amendment rights are not unlimited. *See Heller*, 554 U.S. at 592; *see also Bruen*, 142 S. Ct. at 2128 ("From Blackstone through 19th-century cases, commentators and courts routinely explained that the [Second Amendment] right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."). A felony indictment signifies that a grand jury has found probable cause to believe that the defendant has committed "the most serious category of crime deemed by the legislature to reflect grave misjudgment and maladjustment." *Medina v. Whitaker*, 913 F.3d 152, 158 (D.C. Cir. 2019) (citation omitted). *See, e.g., Fencl*, 2022 WL 17486363, at *2 (pretrial release condition barring gun possession, 18 U.S.C. § 3142(c)(1)(B)(viii), does not violate the Second Amendment; instead, defendant fell outside the amendment's scope because "he has been charged with unlawful possession of firearms based on a finding of probable cause")*, aff'd*, No. 22-50316 (9th Cir. Jan. 26, 2023) (opinion to follow); *United States v. Perez-Garcia*, 628 F. Supp. 3d 1046, 1053 (S.D. Cal. 2022) ("As a person who has been charged with a crime based on a finding of probable cause, Mr. Perez-Garcia would not be considered a 'law-abiding' or responsible citizen, so he is outside the plain text of the Second Amendment"), *aff'd sub nom. United States v. Garcia*, No. 22-50314, 2023 WL 2596689 (9th Cir. Jan. 26, 2023). Accordingly, because felony indictees are not responsible, law-abiding citizens, the Second Amendment does not preclude the government from imposing firearms restrictions on that class of individuals.

**C. Even if the Second Amendment protects Fischer, a pretrial firearms restriction on an individual accused of felony assault survives scrutiny under *Bruen's* historical analysis.**

Even if the Second Amendment's text were thought to cover defendants accused of a crime, a pretrial release condition barring firearms possession remains valid under *Bruen* because it squares with historical tradition. *See Bruen,* 142 S. Ct. at 2126 (a regulation is valid if the government shows "that the regulation is consistent with this Nation's historical tradition of firearm regulation"; *see also id.* at 2133 (noting that government must "identify a well-established and representative historical *analogue*, not a historical *twin*"). That tradition includes: (1) historical restrictions on indicted defendants, including pretrial detention; (2) historical laws restricting the gun rights of groups deemed dangerous or untrustworthy; and (3) historical surety laws restricting the gun rights of people accused of posing a threat. *See Kastner,* 21-cr-725, ECF No. 97 at 6 n.4; *Fencl,* 2022 WL 17486363, at *4 ("This Court finds that when properly interpreted, the Second Amendment permits the restriction of firearm possession by individuals under supervision as a result of pending criminal charges."); *Perez-Garcia*, 628 F. Supp. 3d 1046 at 1053 (holding the same); *Slye*, 2022 WL 9728732, at *3 (same). Accordingly, "Post-*Bruen* courts have upheld that [the Bail Reform Act's] disarmament condition of release for persons charged with federal offenses." *United States v. Rowson*, No. 22 CR. 310 (PAE), 2023 WL 431037, at *20 (S.D.N.Y. Jan. 26, 2023).

*1. Pretrial detention*

A "fundamental right to bail was not universal among the colonies or among the early states." *United States v. Edwards*, 430 A.2d 1321, 1327 (D.C. 1981) (canvassing the English and American history of bail and detention dating back to the thirteenth century); *see also United States v. Perry*, 788 F.2d 100, 111 (3rd Cir. 1986) (observing that most "federal courts that have

addressed the issue have held that there is no absolute right to bail"). While the Eighth Amendment forbids excessive bail, it "fails to say all arrests must be bailable." *Carlson v. Landon*, 342 U.S. 524, 546 (1952). Rather, it "was lifted with slight changes from the English Bill of Rights Act," which was never "thought to accord a right to bail in all cases." *Id.* Legislatures thus retain the power to "defin[e] the classes of cases in which bail shall be allowed," *id.*, and "may ban bail in an entire class of cases." *Stephens*, 594 F.3d at 1039.

American legislatures have always provided for pretrial detention of some indicted defendants. "Capital defendants have been excluded from bail"— and thus detained—"since the colonial days, and there is some evidence that this exclusion was a public-safety measure." Sandra G. Mayson, *Dangerous Defendants*, 127 Yale L.J. 490, 502 (2018); *Slye*, 2022 WL 9728732, at *2 ("The precedent for denial of pretrial release to those accused of crimes dates to the early days of the Republic—indeed to English common law.").

The Judiciary Act of 1789—passed two years before the Second Amendment's ratification— embraced this principle. It provided that a defendant accused of a federal crime could "be arrested, and imprisoned or bailed, as the case may be, for trial." Act of Sept. 24, 1789, ch. XX, 1 Stat. 73, § 33 (1789). Bail was allowed "except where the punishment may be death, in which case it shall not be admitted but by [a court or judge] who shall exercise his discretion therein, regarding the nature and circumstances of the offence, and of the evidence, and the usages of law." *Id.*

Moreover, at the Founding, detention swept broadly because many crimes were punishable by death. Capital punishment for felonies was "ubiquit[ous]" in the late eighteenth century and was "the standard penalty for all serious crimes." See *Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J., concurring in the judgment) (citing Stuart Banner, The Death Penalty: An American History 23 (2002)). Capital crimes "included nonviolent offenses that we recognize as felonies

today, such as counterfeiting currency, embezzlement, and desertion from the army." *Medina*, 913 F.3d at 158; *Furman v. Georgia*, 408 U.S 238, 355 (1972) (Marshall, J., concurring) (listing capital crimes in colonial New England, including "idolatry," "blasphemy," "assault in sudden anger," "adultery," "perjury in a capital trial," and "rebellion"). "Capital punishment for felonies was 'ubiquit[ous]' in the late Eighteenth century and was 'the standard penalty for all serious crimes.'" *Medina*, 913 F.3d at 158, quoting *Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J., concurring in the judgment).

As one court summarized, "history recognized detention as a restriction that could be imposed upon a person who was accused, but not convicted[,] of a crime. Inherent in this severe restriction of liberty is the temporary abridgement of numerous core constitutional rights[,] including . . . the right to bear arms." *Slye*, 2022 WL 9728732, at *2. It would thus "be illogical to conclude that the Court has the authority to set conditions temporarily depriving an accused of all of [those] constitutional protections by ordering his detention but lacks the authority to impose far less severe restrictions, such as ordering his release on bond with a firearms restriction." *Id.* Stated differently, it is difficult to conclude that the public, in 1791, would have understood someone facing outright pretrial detention to be within the scope of those entitled to possess arms. *Cf. Medina*, 913 F.3d at 158 ("it is difficult to conclude that the public, in 1791, would have understood someone facing death and estate forfeiture" (*i.e.*, a felon) "to be within the scope of those entitled to possess arms."

As noted above, § 3142(c)(1)(B)(viii)'s gun-restriction condition imposes a far lesser burden on an indicted defendant than does pretrial detention. Pretrial detention strips a defendant of all Second Amendment rights and severely restricts many other "core constitutional rights," like freedom of speech, freedom of association, and reasonable privacy expectations. *See Slye*, 2022 WL 9728732, at *2 & n.4. In contrast, § 3142(c)(1)(B)(viii) imposes a narrower prohibition—

temporarily disarming a person subject to release—that squares with the historical tradition of affording legislatures broad powers of bail and detention and of detaining defendants charged with serious crimes. The power to detain necessarily encompasses the power to impose that lesser liberty restriction. *See, e.g., United States v. Posada*, No. EP-22-CR-1944(1)-KC, 2023 WL 3027877, at *6 (Apr. 20, 2023) ("If an indictment [was] constitutionally sufficient to trigger a complete prohibition on a defendant's Second Amendment rights [via pretrial detention] at the founding, then it must also be sufficient to temporarily restrict the right to acquire or transport arms while a felony indictment is pending") (cleaned up) (citing cases); *United States v. Alston*, No. 523CR00021FLRN1, 2023 WL 4758734, at *10–11 (E.D.N.C. July 18, 2023) ("*Bruen* instructs courts to consider 'how and why' the modern regulation and its purported historical analogue burden the right to self-defense. . . . [I]f an indictment can justify a total and immediate deprivation of liberty [through pretrial detention], it also justifies lesser deprivations—like limiting a defendant's ability to ship, transport, or receive a firearm.).

### 2. Laws disarming the dangerous or untrustworthy

Historical laws barring guns to people or groups deemed dangerous or untrustworthy, as well as laws making it an offense to misuse guns, also support the constitutionality of the bail condition. "Clearly, [r]egulations limiting or prohibiting access to firearms by specific groups in the interest of public safety have been part of the Nation's historical tradition since the earliest days of our Nation's founding." *United States v. Jackson*, No. CR ELH-22-141, 2023 WL 2499856, at *16 (D. Md. Mar. 13, 2023). *Jackson* observed that "a felony indictment serves as a uniform and objective criteria to restrict access to firearms." *Id.* (citation omitted). And in the context of pretrial detention, there is a further individualized determination under the Section 3142(g) factors.

In England, officers of the Crown could "seize all arms in the custody or possession of any

19

person" whom they "judge[d] dangerous to the Peace of the Kingdom." Militia Act of 1662, 13 & 14 Car. 2, c.3, § 13 (1662). England also disarmed "entire group[s]" for "their perceived disrespect for and disobedience to the Crown and English law." *Range v. Att'y Gen.*, 53 F.4th 262, 275 (3d Cir. 2022), *vacated upon grant of rehearing en banc*, 2023 WL 118469 (Jan. 6, 2023). Thus, "by the time of American independence, England had established a well-practiced tradition of disarming dangerous persons— violent persons and disaffected persons perceived as threatening to the crown." Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Firearms*, 20 Wyo. L. Rev. 249, 261 (2020); *see id.* at 259-61 (detailing history).

States in the period around the American Revolution took similar measures. Some states barred guns for those "[r]efusing to swear an oath, defaming acts of Congress, or failing to defend the colonies." *Folajtar v. Att'y Gen.*, 980 F.3d 897, 908 & n.11 (3d Cir, 2020); *see also Medina*, 913 F.3d at 159 (discussing similar laws); *Kanter v. Barr*, 919 F.3d 437, 454-58 (7th Cir. 2019) (Barrett, J., dissenting) (same). In fact, at least six states disarmed the "disaffected" who refused to take an oath of allegiance to those states. See 5 The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay 479-84 (1886) (1776 law); 7 Records of the Colony of Rhode Island and Providence Plantations, in New England 567 (1776 law); 1 The Public Acts of the General Assembly of North Carolina 231 (1804) (1777 law); 9 Statutes at Large, Being A Collection of All the Laws of Virginia 281-82 (1821) (1777 law); Rutgers, New Jersey Session Laws Online, Acts of the General Assembly of the State of New-Jersey 90 (1777 law); 9 Statutes at Large of Pennsylvania 348 (1779 law). The colonies (and later the states) enacted laws that "prohibit[ed] bearing arms in a way that spreads 'fear' or 'terror' among the people." *Bruen*, 142 S. Ct. at 2145. As *Bruen* observed, such statutes "all but codified the existing common law in this

regard." *Id.* at 2144 n.14 (citing George Webb, The Office and Authority of a Justice of Peace 92 (1736)).

Those provisions show that legislatures had the authority to restrict gun possession by individuals or groups deemed to "act counter to society's welfare," *Folajtar*, 980 F.3d at 909, or who fail to comply with "legal norms," *Range*, 53 F.4th at 278. The law here falls well within that historical tradition because a person may be subjected to the pretrial-release gun condition only after a court or the grand jury finds: (1) probable cause to believe that the defendant committed a crime and (2) that the condition is "the least restrictive" way to assure his appearance and "the safety of any other person or the community,"

18 U.S.C. § 3142(c)(1)(B).

   *3.  Surety laws*

Colonial surety laws also support the firearms restriction. At common law, the surety system allowed any person with "just cause to fear" another person to "demand surety of the peace." 4 William Blackstone, Commentaries on the Laws of England 252 (1769).

The colonies adopted English surety practice. *See* William Rawle, *A View of the Constitution of the United States of America* 126 (2d ed. 1829). For example, New Hampshire authorities could arrest a person who went armed in a threatening manner and "commit him to prison, until he the offender f[ound] such sureties as is required for his good behaviour." Acts and Laws of His Majesty's Province of New-Hampshire:   In New England 1-2 (1771) (1701 statute). Other early colonial laws contained similar provisions. *See* 1 Acts and Resolves, Public and Private, of the Province of Massachusetts Bay 52-53 (1869) (1692 statute); 2 Statutes at Large of Pennsylvania from 1682 to 1801 23 (1896) (1700 statute); 1 Laws of the State of Delaware from the Fourteenth Day of October, One Thousand Seven Hundred, to the Eighteenth Day of August,

One Thousand Seven Hundred and Ninety-Seven 52 (1797) (1700 statute); Acts and Laws of His Majesties Colony of Connecticut in New England 91 (1901) (1702 statute).

Thus, in 1829, before the passage of the surety statutes discussed in *Bruen*, *see* 142 S. Ct. at 2148, William Rawle explained that "even the carrying of arms abroad by a single individual, attended with circumstances giving just reason to fear that he purposes to make an unlawful use of them, would be sufficient cause to require him to give surety of the peace" and that "[i]f he refused he would be liable to imprisonment." William Rawle, A View of the Constitution of the United States of America 126 (2d ed. 1829).

In *Bruen*, the Court deemed later, 19th-century surety laws insufficiently analogous to the New York law at issue because the surety "laws were not *bans* on public carry, and they typically targeted only those threatening to do harm." 142 S. Ct. at 2148. The law here bears more similarities to surety laws, as it allows for a gun restriction only after (1) a grand jury finds probable cause that a crime was committed and (2) a court determines that the condition is "the least restrictive" way to assure community safety, 18 U.S.C. § 3142(c)(1)(B). And like surety laws, the gun condition restricts rights only temporarily. Courts have thus held that surety laws are similar enough to support the bail condition's constitutionality. *See*, *e.g.*, *Fencl*, 2022 WL 17486363, at *3; *United States v. Perez-Garcia*, No. 22-CR-1581-GPC, 2022 WL 17477918, at *4-*5 (S.D. Cal. Dec. 6, 2022).

### 4. *Fischer's authorities do not invalidate the pretrial firearms restriction*

Fischer cites no cases invalidating the firearms restriction as a condition of pretrial release. Instead, he cites three cases invalidating a different statute, 18 U.S.C. § 922(n) (which criminalizes the receipt of firearms by individuals under felony indictment) not the Bail Reform Act. Mot. at 4 (citing *United States v. Stambaugh*, No. 22CR218-PRW, 2022 WL 16936043, at *3-6 (W.D. Okla.

Nov. 14, 2022); *United States v. Quiroz*, No. 22-CR-104-DC, 2022 WL 4352482, *7 (W.D. Tex. Sept. 19, 2022) (same); *United States v. Hicks*, 2023 WL 164170 (W.D. Tx. Jan. 9, 2023)). None of these three cases ruled on the constitutionality of the restricting a defendant's right to possess firearms as a condition of pretrial release; *Quiroz* in fact distinguished the statute at issue there from the pretrial release setting, noting the additional procedural safeguards present at the detention stage. *See* 2022 WL 4352482 at *11. Magistrate Judge Upadhyaya deemed it "inapposite." Order, *Kastner,* No. 21-cr-725 ECF No. 97 at 6.

Fischer also does not acknowledge the greater number of cases that have disagreed with his authorities, upholding Section 922(n) under *Bruen* for reasons equally applicable to the Bail Reform Act's firearms restriction. A "robust majority" of district courts to consider the question post-*Bruen* have upheld § 922(n).[2] *United States v. Posada*, No. EP-22-CR-1944(1)-KC, 2023 WL 3027877, at *6 (Apr. 20, 2023) (citing cases); *Rowson,* 2023 WL 431037, at *19-*24 (disagreeing with *Quiroz, Stambaugh,* and *Hicks* and finding that surety statutes and laws disarming dangerous persons demonstrate that Section 922(n) is consistent with historical precedents).[3] The weight of authority does not favor Fischer's position, particularly in the context of the Bail Reform Act.

---

[2] The Fifth Circuit also upheld § 922(n) on plain-error review. *See United States v. Rodriguez*, No. 22-10896, 2023 WL 4044409 (5th Cir. June 16, 2023). While finding it unnecessary to decide the question, the Seventh Circuit found it unlikely that § 922(n) "would be held invalid across the board." *United States v. Holden*, 70 F.4th 1015, 1017–18 (7th Cir. 2023). The Seventh Circuit also distinguished between applications of Section 922(n) to people indicted for, for example, antitrust offenses, and those under indictment for using violence against a domestic partner. While pretrial firearms restrictions are constitutional regardless of the category of an offense of which a person is accused, Fischer, who has been indicted for assault on a federal officer, would undoubtedly fall in the latter category.

[3] *See also, e.g., United States v. Alston*, No. 523CR00021FLRN1, 2023 WL 4758734, at *10–11 (E.D.N.C. July 18, 2023); *United States v. Evenson*, No. CR-23-24-BLG-SPW, 2023 WL 3947828 (D. Mont. June 12, 2023); *United States v. Adger*, No. 1:22-cr-102 (S.D. Ga. May 24, 2023); *United States v. Johnson*, No. 23-cr-41 (S.D. Al. May 3, 2023); *United States v. Smith*, No. CR

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court deny defendant's motion and retain the current firearms restriction.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:       /s/
ALEXIS J. LOEB
Assistant United States Attorney
Detailee
California Bar No. 269895
450 Golden Gate Ave, 11th Floor
San Francisco, CA 94102
Alexis.loeb@usdoj.gov
(415) 436-7168

---

122-081, 2023 WL 3012007 (S.D. Ga. Mar. 29, 2023), *report and recommendation adopted,* No. CR 122-081, 2023 WL 3010178 (S.D. Ga. Apr. 19,2023); United States v. Now, No. 22-CR-150, 2023 WL 2717517, at *9 (E.D. Wis. Mar. 15, 2023), *report and recommendation adopted,* No. 22-CR-150, 2023 WL 2710340 (E.D. Wis. Mar. 30, 2023); *United States v. Jackson*, No. 1:22-cr-141, 2023 WL 2499856 (D. Md. Mar. 13, 2023); *United States v. Stennerson*, No. CR 22-139-BLG-SPW, 2023 WL 2214351 (D. Mont. Feb. 24, 2023); *United States v. Bartucci*, No. 1:19-cr-00244-ADA-BAM, 2023 WL 2189530; *United States v. Gore*, No. 2:23-CR-04, 2023 WL 2141032, at *4 (S.D. Ohio Feb. 21, 2023); *United States v. Simien*, No. SA-22-CR-00379-JKP, 2023 WL 1980487 (W.D. Tex. Feb. 10, 2023); *United States v. Kelly*, No. 3:22-cr-37, 2022 WL 17336578 (Nov. 16, 2022); *United States v. Kays*, No. cr-22-40-D, 2022 WL 3718519 (W.D. Okla. Aug. 29, 2022). *But see United States v. Sanchez-Tena*, No. 7:22-cr-160 (W.D. Tex. Nov. 15, 2022).